628 N.E.2d 351 (1993)
256 Ill. App.3d 445
194 Ill.Dec. 854
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Artra WASHINGTON, Defendant-Appellant.
No. 1-90-3121.
Appellate Court of Illinois, First District, First Division.
November 15, 1993.
*352 Rita A. Fry, First Asst. Public Defender of Cook County, Chicago, for defendant-appellant (Lisa S. Ottenfeld, Asst. Public Defender, of counsel).
Jack O'Malley, Cook County State's Atty., Chicago, for plaintiff-appellee (Renee Goldfarb, Veronica X. Calderon, and Catherine A. Hufford, Asst. State's Attys., of counsel).
Justice BUCKLEY delivered the opinion of the court:
Following a jury trial, defendant Artra Washington was found guilty of first-degree murder. The trial judge sentenced defendant to 60 years in the Illinois State Penitentiary. On appeal, defendant contends: (1) that the trial judge erred in finding that the defense failed to make a prima facie showing of purposeful discrimination in the State's exercise of its peremptory challenges against black males; (2) that the trial judge usurped the jury's function as trier of fact and deprived defendant of his defense by refusing to give the defendant's involuntary manslaughter instruction; (3) that the prosecutor committed numerous acts of egregious misconduct calculated to inflame the passions of the jury; and (4) that the Illinois second-degree murder statute violates due process because it relieves the prosecution from the requirement of proving every element of murder beyond a reasonable doubt.
During jury selection, after the first panel of 14 veniremembers was questioned, the State used four of its peremptory challenges. The State exercised two of those challenges against black men. The defense objected and moved for a mistrial on the ground that the State was purposely excluding black males from the jury through a discriminatory use of its peremptory challenges. The court listened to arguments from counsel and ruled that defendant failed to make a prima facie showing of purposeful racial discrimination. The judge stated:
"At this point I don't believe the defense has made a prima facie case. It does not appear to me that the State is excluding blacks, which is the decision in Batson and I don't see any purposeful action on behalf of the jury commissioner in sending down a venire which indicates only three female [sic] Blacks.
There are quite a few blacks on the venire, and I believe that there is no violation of the defendant's constitutional right at this point in time, and both motions are denied."
Ultimately, the chosen jury consisted of six white males, one white female, and five black *353 females. One white female and one black female were chosen as alternate jurors.
The following facts were adduced at trial. Mrs. Frankie Lewis testified that, on July 13, 1988, she was at home baby-sitting her grandchildren Keith, Patrick, Robert, and Terrance while her daughter, Andrea Lewis, was at school. Frankie's son Anthony was also there and Terrance was helping him paint the house. At some point in the day, another of Frankie's daughters, Denise, came home. Denise lived with Frankie. Frankie stated that, at approximately 11 p.m., she received a telephone call from her granddaughter, Eugena Heard. Eugena was the wife of defendant. After speaking with Eugena, Denise and Andrea went to pick up Eugena and two of her children. They drove them to Patricia Heard's home. Patricia is Eugena's mother and Denise and Andrea's sister. Denise then returned home.
Frankie testified that, on July 14, 1988, at approximately 2:30 a.m., she was awakened by defendant's "knocking on the door and screaming." She told him that his wife and children were not in the house and he left. At approximately 4 a.m., defendant returned. According to Frankie, he was screaming for his wife and children and banging on the bedroom windows and the front door. She testified that, when he saw her through the window, he called her an "old grey haired bitch." Frankie said she then grabbed a pool stick and went outside. Her son Anthony was right behind her and when she went to swing the stick at defendant she hit her son in the head. Anthony took the stick from his mother and chased the defendant. According to Frankie, Anthony caught defendant and then pushed him away telling him to leave. Frankie testified that she saw defendant reach under the seat of his car and she warned Anthony. Anthony then broke the front windshield of the car with the pool stick. Defendant then began to leave, but was stopped by the police who had been called by Denise.
Frankie told officer Kanshal Proctor that defendant's wife and children were not in her house. Proctor then told defendant to go home. Frankie testified that defendant said he would be back and Proctor told him that if he did come back he would be arrested.
According to Frankie, at approximately 5:30 a.m., defendant returned and broke the windshield on her car. Anthony, Denise, Patrick, and Keith went outside into the front yard, while Frankie and Terrance stayed in the front doorway. Frankie testified that defendant yelled, "this is what I think about you, all of you Lewis son-of-a-bitches" and he pulled a shotgun out of his car. Frankie stated that, when defendant fired the weapon the first time, everyone hit the ground and began crawling back to the house. She said that the bullet went right past her. She did not realize the bullet had hit Terrance in the arm until she heard him say, "momma, I'm hit. I bleed." Frankie testified that she and Denise had helped Terrance to the bathroom to wash the blood off his arm when another shot rang out. This bullet also went through the front door, ricochetted, and hit Terrance in the chest. According to Frankie, he spun around and collapsed on the bathroom floor. She said that Terrance mumbled "help me, help me" just before he died. Frankie also testified that she was a foster mother and that, in addition to Denise, Anthony, Keith, Patrick, and Terrance, there were four other foster children asleep in the house.
John Glaubke, a Cook County sheriff's investigator, testified that, on July 14, 1988, at approximately 6 a.m. he was called to investigate a homicide at 1405 East 15th Place in Ford Heights. Glaubke stated that he took photographs and measurements of the crime scene. He recovered a rifle deer slug from the living room wall and another slug on the floor in the hallway. He stated that Proctor gave him a "live" .20 gauge shotgun shell and a spent casing which Proctor had found on the scene.
Dr. Nancy Jones, a deputy medical examiner, testified that she performed the post mortem examination on Terrance. She stated that Terrance had a "through-and-through" gunshot wound to the chest. According to Jones, the bullet hit Terrance in the left side of his chest and exited the right side. Jones stated that her examination also revealed a "graze wound" on Terrance's right *354 forearm. In her opinion, "Terrance Lewis died as a result of a shotgun wound to the chest."
Anthony and Denise Lewis testified that they were at their mother's house at the time of the incident. Their testimony was consistent with Frankie's testimony.
Kanshal Proctor, a Ford Heights police officer, testified that, at approximately 4 a.m., he and his partner responded to a call of a disturbance at 1405 East 15th Place. When they arrived, they noticed defendant driving away from the location and so they stopped him. The windshield of his car was broken. Proctor stated that he had a conversation with Frankie and defendant. He told defendant to go home and not to come back because if he did he would be arrested. Proctor testified that, at approximately 5:30 a.m., they received another call of a disturbance at 1405 East 15th Place, but that this disturbance involved a shooting. According to Proctor, when he and his partner arrived everyone was "upset." He entered the house and observed Terrance lying on his back in the bathroom. He then went out into the street and recovered several shotgun shells from the street. One shell was "full" and the other was "empty."
Detective Warren DeGraff testified that, on July 19, 1988, at approximately 12 p.m., he arrested defendant at a McDonald's restaurant on 162nd street. When defendant first was taken into custody, he gave a false name to the police.
Defendant testified that, on July 14, 1988, he went to Frankie's house looking for his wife and children. Frankie told him they were not there and that she would call the police if he did not leave. According to defendant, he did not believe that his family was not there and so he went around to the bedroom windows and yelled for his wife. He stated that, when he came back around to the front door, Frankie came out with a golf club in her hand. He said that Anthony came out the door behind her, took the club, and chased after him. Anthony grabbed him at his car and told him that his family was not there and that he should "get the hell out of here." He testified that he got in the car, put up his windows, locked his doors, and started his car. According to defendant, as he started his car, Anthony smashed the windshield.
After Proctor arrived and told him to leave, defendant went to his mother's house to get a "rifle" he had hidden in the storage room. He then drove back to Frankie's house. When he arrived, he grabbed a hammer out of his car and broke the windshield on Frankie's car. He stated that he was walking back to his car, when he saw "Anthony come running at me with a club." He stated that he ran to the car and grabbed the rifle. He testified that he shot the gun twice. According to defendant, Anthony was approximately 30 or 40 feet away when he fired the weapon, but that he did not aim it at Anthony. He testified that he fired at the house and did not intend to kill anyone. He stated that as soon as he saw Anthony on the ground, he threw the gun in the car and left. He said that when he saw Anthony coming at him with the club, he "feared that he was going to harm me."
On cross-examination, defendant stated that he went back to Frankie's house because he was mad and did not believe that his family was not in her house. He explained that he brought the gun with him because he was alone and needed protection. He testified that, when he fired the gun, he aimed at the door of the house. He stated that he did not fire at Anthony and did not see anyone else in the yard except Anthony. He also testified that, when he began shooting, he was not afraid because he had a shotgun.
At the jury instruction conference, the trial judge denied defense counsel's request for an involuntary manslaughter instruction. The jury was instructed on first-degree murder and second-degree murder premised on an unreasonable belief in the need for self defense. Defendant was found guilty of first-degree murder and sentenced to 60 years in prison.
Defendant's first contention on appeal is that the trial judge erred in finding that he had not made a prima facie showing that the State was using its peremptory challenges in a purposefully discriminatory manner against a cognizable group, namely black males, in *355 violation of his constitutional rights and the decision in Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Defendant asserts that the principles of Batson are not applicable only to race simply because only racial discrimination was involved in Batson. He argues that, under a broad reading of Batson, the State is forbidden from discriminating against any "stereotyped group." He asserts that black males are an identifiable class of citizens who may not be excluded from jury service solely on this ground and that the two black men the State peremptorily challenged would not have been excluded but for their gender and their race.
The State asserts that the principles outlined in Batson only forbid racial discrimination in jury selection. The State maintains, in effect, that the analyses of race discrimination and gender discrimination are mutually exclusive and that the category "male-blacks" does not fall within the realm of Batson. Assuming there is such a category, the State asserts that defendant has failed to establish a prima facie case of "race-gender" discrimination.
In Batson, the United States Supreme Court recognized that the State denies a black defendant the equal protection of the laws as protected by the fourteenth amendment when a prosecutor peremptorily challenges black veniremembers "solely on account of their race." (Batson, 476 U.S. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 83.) The Illinois Supreme Court has set forth "relevant circumstances" for the trial court to consider when determining whether there was discrimination in jury selection and these include:
"[A] `pattern' of strikes against black jurors; `the prosecutor's questions and statements during voir dire examination and in exercising his challenges' [citation]; the disproportionate use of peremptory challenges against blacks [citations]; the level of black representation in the venire as compared to the jury [citations]; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and victim [citations]; and the race of the witnesses [citation]." People v. Edwards (1991), 144 Ill.2d 108, 153, 161 Ill.Dec. 788, 806, 579 N.E.2d 336, 354, citing People v. Evans (1988), 125 Ill.2d 50, 63-64, 125 Ill.Dec. 790, 795, 530 N.E.2d 1360, 1365.
Additionally, in People v. Mitchell (1992), 228 Ill.App.3d 917, 927, 171 Ill.Dec. 62, 68, 593 N.E.2d 882, 888, appeal allowed (1992), 146 Ill.2d 643, 176 Ill.Dec. 813, 602 N.E.2d 467, aff'd in part, vacated in part and cause remanded (1993), 155 Ill.2d 344, 185 Ill.Dec. 528, 614 N.E.2d 1213, the second division, through a broad reading of Batson, expressly held that a "defendant has the constitutional right to a jury which has been assembled without gender discrimination." After the briefs in the instant case were filed and oral arguments were heard, however, the Illinois Supreme Court vacated this part of the Mitchell holding on the grounds that the appellate court should not have considered this question because it was unnecessary to a disposition of the case and was "essentially advisory and speculative." (People v. Mitchell (1993), 155 Ill.2d 344, 356, 185 Ill.Dec. 528, 533, 614 N.E.2d 1213, 1218.) Article I, section 18 of the Illinois Constitution, however, provides that:
"The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts." (Emphasis added.) (Ill. Const.1970, art. I, sec. 18.)
Additionally, in People v. Ellis (1974), 57 Ill.2d 127, 132-33, 311 N.E.2d 98, 101, the Illinois Supreme Court concluded that section 18 of article I "was intended to supplement and expand the guaranties of the equal protection provision of the Bill of Rights and requires us to hold that a classification based on sex is a `suspect classification' which, to be held valid, must withstand `strict judicial scrutiny.'" Therefore, we believe a strong argument can be made that, under the Illinois Constitution, it would be a violation of equal protection to peremptorily challenge potential jurors solely on account of their gender.
Defendant does not argue on appeal, however, nor did he assert at the trial court level, that the State violated his constitutional rights by purposefully excluding certain jurors *356 solely on account of their race or solely on account of their sex. Instead, defendant argues that the challenged jurors were excluded because of both their race and their sex. He maintains that "blacks" and "men" are not necessarily two mutually exclusive groups, but that "black men" should be viewed as one group when considering the relevant circumstances which can raise an inference of discrimination. Defendant argues that the Batson rationale prohibits discrimination against any person solely on account of his "membership in a stereotyped group." He asserts that black males are such a "stereotyped" group and may not be excluded solely on this basis.
Applying the "relevant circumstances" to male blacks as a group, defendant points out that 100% of the black males questioned on the voir dire were peremptorily challenged by the State and, therefore, a "pattern" of strikes against black males is evident. Additionally, he asserts that an inference of discrimination is raised by the fact that, although 8% of the venire consisted of black males, there were no black males on the jury. He contends that, although the two black men challenged had similar backgrounds, white men who were accepted also had similar backgrounds. Finally, although the victim, defendant, and the State's main witnesses were black, defendant was a black male while most of the State's main witnesses were black females. Defendant argues that this last factor is very important, because, under the facts of this case, the prosecutor's actions contribute to the stereotype that the "overbearing strong matriarchal black woman has emasculated the black man and made him obsolete as a social member of the family." As such, defendant contends that excluding black men from the jury in this case violates Batson because they fall within a stereotyped group.
We conclude that the principles of Batson cannot be applied to "black men" as a cognizable group. The Batson Court held that blacks could not be excluded from a jury solely on account of their race. Black men and black women, logic would tell us, are subgroups of this cognizable racial category. Likewise, since men are a cognizable gender group under the Illinois Constitution, black men and white men are subgroups of it. If we apply the Batson principles at the prima facie stage of the analysis to subcategories of race and gender, not only will we have created new hybrid suspect groups, but we will have effectively destroyed both the peremptory challenge and the Batson decision. It would become a thing of the past for defendants to claim only general race discrimination or even gender discrimination, because all challenged jurors could easily fit into some subcategory. Numerous Batson hearings would have to be held because every challenged juror would belong to several general categories and, of course, hybrid subcategories would grow exponentially. Establishing a prima facie case of discrimination would always be easier when a challenged juror belongs to a subcategory rather than a general category. In theory, if the categories are narrowed down enough, there would be some potential jurors with certain characteristics who could never be challenged without making a full blown Batson hearing necessary.
"[I]f the Supreme Court in Batson had desired, it could have abolished the peremptory challenge or prohibited the exercise of the challenges on the basis of race, gender, age, or other group classification." (United States v. Hamilton (4th Cir.1988), 850 F.2d 1038, 1042.) We believe, however, along with several other courts, that "in light of the important position of the peremptory challenge in our jury system, the Court intended Batson to apply to prohibit the exercise of peremptory challenges on the basis of race only." (Hamilton, 850 F.2d at 1042-43; see State v. Adams (La.App. 4th Cir.1988), 533 So.2d 1060, 1063; State v. Clay (Mo.App. 1989), 779 S.W.2d 673, 676.) Although "we do not applaud the striking of jurors for any reason relating to group classifications" (Hamilton, 850 F.2d at 1042), we do not believe Batson applies to alleged combined "race-gender" discrimination. Therefore, for the foregoing reasons, we hold that the trial judge did not err in finding that defendant failed to make a prima facie showing of discrimination in the State's exercise of its peremptory challenges against black males.
*357 Defendant's second argument on appeal is that the trial judge's refusal to give a jury instruction on involuntary manslaughter was erroneous and deprived him of his defense. Defendant contends that the trial judge, in refusing the involuntary manslaughter instruction, improperly made a factual determination as to his mental state at the time of the offense. The State, on the other hand, maintains that defendant's admitted conduct negates the possibility of involuntary manslaughter.
Both first- and second-degree murder require that the actor have the intent to kill or cause great bodily harm or have knowledge that such acts "create a strong probability of death or great bodily harm." (Ill.Rev.Stat. 1991, ch. 38, par. 9-1 (now 720 ILCS 5/9-1 (West 1992)); People v. Austin (1990), 207 Ill.App.3d 896, 899, 152 Ill.Dec. 805, 807, 566 N.E.2d 492, 494.) A party is guilty of the lesser offense of involuntary manslaughter, on the other hand, if he unintentionally kills another individual by recklessly performing certain acts which are "likely to cause death or great bodily harm." (Ill.Rev.Stat.1991, ch. 38, par. 9-3(a) (now 720 ILCS 5/9-3(a) (West 1992)); Austin, 207 Ill.App.3d at 899, 152 Ill.Dec. at 806, 566 N.E.2d at 493; People v. Cannon (1988), 176 Ill.App.3d 49, 55, 125 Ill.Dec. 626, 630, 530 N.E.2d 1035, 1039.) Thus, "[m]urder and the lesser included offense of involuntary manslaughter are distinguished only in terms of the mental state required." Austin, 207 Ill.App.3d at 899, 152 Ill.Dec. at 807, 566 N.E.2d at 494.
In Illinois, "an included-offense instruction is required only in cases where the jury could rationally find the defendant guilty of the lesser offense and not guilty of the greater offense." (People v. Perez (1985), 108 Ill.2d 70, 81, 90 Ill.Dec. 932, 937, 483 N.E.2d 250, 255, citing Hopper v. Evans (1982), 456 U.S. 605, 612-13, 102 S.Ct. 2049, 2053-54, 72 L.Ed.2d 367, 373-74.) An involuntary manslaughter instruction is improper, therefore, if there is no evidence which would reduce the crime to manslaughter (People v. Ward (1984), 101 Ill.2d 443, 451, 79 Ill.Dec. 142, 145, 463 N.E.2d 696, 699) or "when the nature of defendant's conduct is of such a character so as to defeat any assertion of reckless or inadvertent conduct." People v. Trotter (1988), 178 Ill.App.3d 292, 298, 127 Ill.Dec. 471, 474, 533 N.E.2d 89, 92.
It has been held that intentionally firing a weapon at an occupied building is an act which has a "natural tendency" to cause death or great bodily harm and is of such a character as to defeat any assertion of recklessness. (Cannon, 176 Ill.App.3d at 55, 125 Ill.Dec. at 630, 530 N.E.2d at 1039.) In Cannon, 176 Ill.App.3d at 55, 125 Ill.Dec. at 630, 530 N.E.2d at 1039, the defendant "intentionally and deliberately aimed and fired shots at the 2051 West Lake Street building which he knew was a residential building." The appellate court held that the trial judge properly refused to give a jury instruction on involuntary manslaughter, because "voluntarily and willfully" firing a rifle at a residential building "has a natural tendency to cause death or great bodily harm." Cannon, 176 Ill.App.3d at 55, 125 Ill.Dec. at 630, 530 N.E.2d at 1039.
Similarly, in the instant case, defendant's instruction on involuntary manslaughter was properly denied. Defendant's trial testimony that he was aiming at the house when he fired the shotgun and did not intend to kill anyone does not create a jury question on the issue of recklessness. In fact, it negates it. Defendant admitted that he intentionally and deliberately aimed and fired a shotgun at the front door of a house he knew was occupied with people. In fact, testimony of several witnesses placed Frankie and Terrance in the doorway at the time the shooting began. Such conduct goes beyond mere recklessness and illustrates more than just a conscious disregard of a substantial and unjustifiable risk. (Ill.Rev.Stat.1991, ch. 38, par. 4-6 (now 720 ILCS 5/4-6 (West 1992)).) Intentionally and deliberately firing a shotgun at an occupied home is an act which a person is presumed to know "create[s] a strong probability of death or great bodily harm to * * * another." (Ill.Rev.Stat.1991, ch. 38, par. 9-1(a) (now 720 ILCS 5/9-1(a) (West 1992)); see Cannon, 176 Ill.App.3d at 55, 125 Ill.Dec. at 630, 530 N.E.2d at 1039.) Therefore, it would have been error for the trial judge to have given the jury an instruction on involuntary manslaughter.
*358 Defendant's third contention on appeal is that the prosecutor "committed numerous acts of misconduct calculated to inflame the passions of the jury" when, during closing argument, he (a) played on the sympathies of the jury by discussing the future the victim would not have while holding up a photo of the victim; (b) implied that defendant's prior conviction could be considered to show his propensity to commit crime; and (c) improperly gave his opinion as to what he believed defense counsel's theory of defense was in regards to defendant's guilt.
Defendant first asserts that the prosecutor improperly discussed the future the victim would not have while holding up a picture of the victim solely for the purpose of arousing the passions of the jury. He argues that the prosecutor was urging the jury to ignore the facts of the case and focus solely upon the grave harm to the victim. Defendant points specifically to the following passage during the prosecutor's closing argument:
"MR. LINEHAN [Assistant State's Attorney]: Now, society measures by the way it treats the helpless. Also measuredjudged by those who mistreat the helpless. I'm sure over the last few days that you people have had an opportunity to be sitting there to think about what is happening. And, to think about Terrance and you are allowed to think about him and draw reasonable inferences.
MR. CARMODY [Defense counsel]: Objection.
THE COURT: Objection overruled. Again, ladies and gentlemen, this is argument. It is to be considered as argument.
MR. LINEHAN [Assistant State's Attorney]: And, you can reasonably infer that if his life had not ended perhaps he would have had a wife, perhaps he would have played little league. Perhaps he could have played football. Perhaps he could be a State's Attorney, or be a teacher or be a public defender or whatever. But, he wasn't given that opportunity because of the defendant. The defendant who Mr. McKeigue wants us all to feel sorry for. This is what he did. And, he doesn't want to accept the responsibility for what he did. And, he wants something less.
Well, take a good look at these pictures when you go back to the jury room. And, you tell yourself that somebody like Mr. Washington deserves a break.
MR. CARMODY [Defense counsel]: Objection. That's the purpose
THE COURT: Objection sustained."
The State responds that defendant has waived this issue on review. If the issue is not waived, the State asserts that the comments were based upon facts in evidence and invited by defense counsel's comments. Alternatively, the State argues that any error was harmless.
In order to preserve an issue for review, defendant must make a contemporaneous trial objection and renew that objection in a written post-trial motion. (People v. Enoch (1988), 122 Ill.2d 176, 186, 119 Ill.Dec. 265, 271, 522 N.E.2d 1124, 1130.) Defense counsel objected when the prosecutor held up a picture of the victim before the jury members and told them to remember the picture if they started thinking that "somebody like Mr. Washington deserves a break." Defendant also raised this objection in his post-trial motion for a new trial. Therefore, defendant has not waived review of this prosecutorial remark. The trial judge, however, sustained defendant's objection. Therefore, even if the statement was improper, any prejudice resulting from the comment was cured. (People v. Armstrong (1993), 244 Ill. App.3d 545, 557, 185 Ill.Dec. 293, 301, 614 N.E.2d 427, 435; People v. Maldonado (1989), 193 Ill.App.3d 1062, 1071, 140 Ill.Dec. 886, 892, 550 N.E.2d 1011, 1017.) Defendant failed to object to the other prosecutorial comments which referred to the possible future achievements of the victim. Thus, any question as to the propriety of these comments is waived. Maldonado, 193 Ill.App.3d at 1071, 140 Ill.Dec. at 892, 550 N.E.2d at 1017.
Defendant also asserts that the prosecutor improperly implied in his closing argument that defendant's prior conviction could be considered to show his propensity to commit crime. Defendant points to the prosecutor's *359 statement in closing argument that "[p]rior conviction only considered for as to his credibility [sic]. But, it is his baggage; and he brought it in with him."
A review of this comment in context with the prosecutor's closing argument clearly shows that the prosecutor mentioned defendant's prior conviction for exactly the reason he statedin order to reflect upon defendant's credibility, not to show his propensity to commit crime. The prosecutor made this statement after reviewing defendant's explanations for his actions after the murder and while arguing that defendant could not be believed. He pointed out that defendant had said he never intended to shoot anyone and did not know he had done so until later. The prosecutor urged the jury not to believe defendant because after the shooting he threw out the shotgun. Next, the prosecutor urged the jury not to believe defendant when he said he was worried about his family, because, after the shooting, he hid his car, got a hotel room, and did not call his mother, his brother or his wife. Finally, he reminded the jury that when defendant was arrested he lied to the police and gave them a false name. It was at this point that the prosecutor mentioned that defendant's prior conviction could also be used by the jury to assess defendant's credibility.
The defendant also maintains that it was improper for the prosecutor to argue to the jury that defendant should not have squandered money on a shotgun when his family could not even afford a telephone. He asserts that this comment was not based on facts in evidence because there is no testimony regarding the reason defendant's family did not have a telephone. This comment may not have been supported by the evidence, but it was inconsequential and harmless beyond a reasonable doubt.
Defendant's final assertion is that the prosecutor took "unfair advantage of the court's denial of the involuntary manslaughter instruction" and gave his opinion as to the defendant's theory of defense. Specifically, defendant complains about the following highlighted comments by the prosecutor:
"MR. CASSIDAY [Assistant State's Attorney]: Ladies and gentlemen, if we don't prove each of these propositions of first degree murder, if we don't meet each of those propositions, the one I said, those three, then you should find the defendant not guilty. However, if we met those three propositions and we did, we showed you that he killed Terrance. We showed that he intended to do so or if he didn't intend to do so that he knew his acts created strong probability of death or great bodily harm to Terrance or another.
And, we have shown that he was not justified in using the force he did. If we met that then you have to go on to consider mitigating factors. You have to consider whether mitigating factors had been proved so that the defendant is guilty of lessor [sic] offense of second degree murder instead of first degree murder. And, that's what he is counting on. If he gets that he wins.

MR. CARMODY [Defense counsel]: Objection, judge.
THE COURT: Objection overruled.
MR. CASSIDAY [Assistant State's Attorney]: You heard in the opening statements counsel that he came before you and said he is not being asked to be resolved of any responsibility. That's what he wants, a second degree murder, ladies and gentlemen. And, there is no evidence to support it whatsoever.
MR. CARMODY [Defense counsel]: Objection, judge.
THE COURT: Counsel may comment on the evidence and reasonable inferences therefrom. What the lawyers say during argument is not evidence. Is simply argument. Remember that, ladies and gentlemen."
Defendant also asserts that the following highlighted comments by the prosecutor were improper.
"MR. LINEHAN [Assistant State's Attorney]: And, if you were to believe Mr. McKeigue's argument that he did not want to hurt Anthony, only to scare him, well, then you don't even have to get to the propositions. It would appear to me what *360 Mr. McKeigue is telling you is either first degree murder or total not guilty.

MR. CARMODY [Defense counsel]: Objection, no statement to that.
THE COURT: Objection overruled. This is argument. And, the jury is to consider it only as argument and not what the lawyers says [sic] as evidence.
MR. LINEHAN [Assistant State's Attorney]: You will get the instructions and instructions will show you that in all criminal cases the burden of proof is on the State beyond a reasonable doubt. However, in these cases once the defendant raises the issue whether there is a mitigating factor the defendant has a burden to prove by a preponderance of the evidence that in fact that mitigating circumstance exists.
Mr. McKeigue didn't even mention that. So I think as twelve people you can reasonably infer that they don't think [defendant] did anything wrong. It is either first-degree murder or not guilty.

MR. CARMODY [Defense counsel]: Objection. The court will instruct the jury.
THE COURT: Objection overruled. This is argument."
The State maintains that these statements were proper comments based upon defendant's defense of lack of intent and invited by defendant's closing argument. Assuming the comments were improper, the State argues that the errors were cured by the court. Alternatively, the State asserts that the errors were harmless beyond a reasonable doubt.
Defense counsel repeatedly argued throughout his opening statement and his closing argument that defendant never intended to kill anyone and that he was not guilty of first-degree murder. Counsel never argued that defendant had an unreasonable belief in self-defense. In fact, defendant testified that when he fired the shotgun he was not afraid. He also stated he did not fire at Anthony, but at the house. Defense counsel argued that defendant was only trying to scare Anthony; he was not intending to hurt anybody.
The prosecutor's comments were not opinion, but permissible argument based upon the facts in evidence. (People v. Batson (1992), 225 Ill.App.3d 157, 166, 167 Ill.Dec. 280, 285, 587 N.E.2d 549, 554; People v. Nightengale (1988), 168 Ill.App.3d 968, 974, 119 Ill.Dec. 668, 673, 523 N.E.2d 136, 141.) Additionally, it is not improper for a prosecutor to argue to the jury that the evidence does not support a conviction on a lesser offense. Nor is it improper for a prosecutor to characterize the defendant's defense as "guilty of first degree murder or not guilty" if such an interpretation is supported by the facts in evidence and reasonable inferences therefrom. Moreover, the prosecutor's comments here were invited by defendant's continued assertions that he did not intend to shoot anybody and defense counsel's failure to introduce any evidence on a mitigating circumstance that would reduce first-degree murder to second-degree murder. People v. Franklin (1990), 135 Ill.2d 78, 100, 142 Ill. Dec. 152, 162, 552 N.E.2d 743, 753.
Defendant's last contention on appeal is that Illinois' second-degree murder statute violates due process and is unconstitutional because it relieves the prosecution from the requirement of having to prove every element of murder beyond a reasonable doubt. There is no merit to this contention. A long line of Illinois appellate court cases has held this statute constitutional. See People v. Newbern (1991), 219 Ill.App.3d 333, 161 Ill.Dec. 912, 579 N.E.2d 583; People v. Willis (1991), 217 Ill.App.3d 909, 160 Ill. Dec. 644, 577 N.E.2d 1215; People v. Doss (1991), 214 Ill.App.3d 1051, 158 Ill.Dec. 693, 574 N.E.2d 806; People v. Clark (1991), 207 Ill.App.3d 439, 152 Ill.Dec. 455, 565 N.E.2d 1373; People v. Jerome (1990), 206 Ill.App.3d 428, 151 Ill.Dec. 244, 564 N.E.2d 221; People v. Buckner (1990), 203 Ill.App.3d 525, 149 Ill.Dec. 57, 561 N.E.2d 335.
In In re Winship, (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375, the Supreme Court explicitly held that "the Due Process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508, the Court considered a Maine statute which attempted *361 to place upon the defendant the burden of proving the affirmative defense of "sudden provocation" which would reduce the offense to manslaughter. In Maine, the jury was instructed that, if the State established that the murder was "both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." (Newbern, 219 Ill.App.3d at 344-45, 161 Ill.Dec. at 920, 579 N.E.2d at 591, citing Mullaney, 421 U.S. at 686, 95 S.Ct. at 1883, 44 L.Ed.2d at 512.) The court found that the statute violated due process because it placed the burden of proving an element of the crime (malice aforethought) upon the defendant. Newbern, 219 Ill.App.3d at 345, 161 Ill.Dec. at 920, 579 N.E.2d at 591, citing Mullaney, 421 U.S. at 703-04, 95 S.Ct. at 1892, 44 L.Ed.2d at 522.
In Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281, however, the Supreme Court upheld a statute which is very similar to Illinois' murder statute. The Court held that it did not violate due process to allow a defendant to reduce his offense from murder to manslaughter by proving by a preponderance of the evidence that he acted under extreme emotional disturbance. The Court reasoned that, unlike in Mullaney, the State still had to prove every element of murder before the burden shifted to the defendant to prove an affirmative defense.
Similarly, in Martin v. Ohio (1987), 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267, the Court upheld a statute which first required the State to prove every element of the crime charged. The defendant then was permitted to attempt to show that the killing was justified because he acted in self defense. The Martin court held that it did not violate due process to require defendant to prove "self defense" by a preponderance of the evidence. Martin, 480 U.S. at 233, 107 S.Ct. at 1101-02, 94 L.Ed.2d at 274.
Under the reasoning in both Patterson and Martin, the Illinois statute is constitutional because "there is no overlap between any element that the prosecution must prove to establish first degree murder and facts that the defense must prove to reduce the grade of the offense to second degree murder." (Newbern, 219 Ill.App.3d at 351, 161 Ill.Dec. at 924, 579 N.E.2d at 595, citing Haddad, Second Degree Murder Replaces Voluntary Manslaughter in Illinois: Problems Solved, Problems Created, 19 Loy.U.ChLL.J. 995, 1016 (1988).) The Illinois second-degree murder statute still requires the State to prove every element of murder beyond a reasonable doubt. It merely places the burden of proving a mitigating factor such as an "unreasonable belief in self defense" upon the defendant. The jury does not even consider "whether the defendant has met his burden of proof [by a preponderance of the evidence] with regard to second-degree murder until and unless it has first determined that the State has proven beyond a reasonable doubt each of the elements of first-degree murder." (Ill.Rev.Stat.1991, ch. 38, par. 9-2 (now 720 ILCS 5/9-2 (West 1992)).) These mitigating circumstances which the defendant has the burden of proving are not "elements" of the offense which establish his guilt. As Professor O'Neill stated, the mitigating factor of an unreasonable belief in self defense "does not change the fact that the person is still a murderer; it merely results in a less severe punishment * * * [because] defendant is less culpable than other murderers." (Emphasis in original.) (Newbern, 219 Ill.App.3d at 350-51, 161 Ill.Dec. at 923-24, 579 N.E.2d at 594-95, citing O'Neill, An Analysis of Illinois' New Offense of Second Degree Murder, 20 J. Marshall L.Rev. 209, 221-22 (1986).) Therefore, for these reasons, Illinois' second-degree murder statute which places upon the defendant the burden of proving by a preponderance of the evidence a mitigating factor in order to reduce first-degree murder to second-degree murder is not violative of due process.
For the foregoing reasons, we affirm the decision of the circuit court of Cook County.
Affirmed.
MANNING, P.J., and O'CONNOR, J., concur.