# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Carter*, 2013 IL App (2d) 110703

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NATHANIEL A. CARTER, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0703 |
| Filed | August 9, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from defendant's conviction of first-degree murder on an accountability theory, the trial court properly denied defendant's postconviction claim of actual innocence based on an affidavit from the person who was convicted of actually killing the victim stating that defendant was not involved in the offense, since the trial court's decision was not manifestly erroneous. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 00-CF-2593; the Hon. Joseph G. McGraw, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Peter A. Carusona, Glenn Sroka, and Verlin R. Meinz, all of State Appellate Defender's Office, of Ottawa, for appellant. |
| | |
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion. |
| | Presiding Justice Burke and Justice Jorgensen concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant, Nathaniel A. Carter, was convicted based on accountability of the first-degree murder (720 ILCS 5/9-1(a)(3) (West 2000)) of Cornell Thomas and sentenced to 45 years' imprisonment. On direct appeal, defendant raised one issue, regarding jury instructions. In an unpublished decision, *People v. Carter*, No. 2-01-1336 (2003) (unpublished order under Supreme Court Rule 23), this court affirmed.

¶ 2 Defendant later filed a postconviction petition, which was amended several times, culminating in his fourth amended postconviction petition. The State moved to dismiss defendant's petition, and the trial court granted this motion. Defendant appealed, arguing that the trial court erred by dismissing his petition. Defendant had raised several issues in his petition, including a claim of actual innocence based on the affidavit of a codefendant, James Hackler, which stated that James acted alone in the killing of Cornell. In another unpublished decision, this court affirmed the dismissal of all of defendant's postconviction claims except for the one of actual innocence. *People v. Carter*, No. 2-06-1012 (2009) (unpublished order under Supreme Court Rule 23). On that claim, we reversed the judgment and remanded the case, instructing the trial court to hold an evidentiary hearing. Following an evidentiary hearing on defendant's claim of actual innocence, the trial court denied his petition. Defendant appeals, and we affirm.

¶ 3                 I. BACKGROUND

¶ 4                 A. Trial Evidence

¶ 5 We begin by summarizing the evidence adduced at defendant's trial. During opening argument, the State presented the following theory of how Cornell was killed. Defendant and two others, James (nicknamed "Cujo") and David Walker (nicknamed "Dayday"), met at the Rockford Motel to plan a robbery at a drug house at 321 Lincoln Avenue in Rockford. On

the night of the incident, September 30 to October 1, 2000, Cornell picked up his friend, Lashanna Bowman, and they drove to the drug house, where defendant, James, and David were waiting in a car. Cornell exited his car and was ambushed by defendant and James, who were armed. Defendant attempted to rob Cornell and he beat him with his gun. Cornell broke free from defendant and ran into James, who shot him. Cornell stumbled into the street and died. Defendant got back in the car with David, and James hijacked Cornell's car and drove away. Shortly after the murder, defendant returned to the Rockford Motel and met up with James and his wife, Angela Hackler. They told Angela what had happened, including that defendant attempted to rob Cornell, that defendant beat Cornell with his gun, and that during the scuffle some shots were fired. Police later found the gun that killed Cornell, a .38-caliber revolver, in David's apartment. While the State was not sure that defendant had fired the gun, his fingerprints were on the bag that contained it.

¶ 6    State witness Andre Brass, a Rockford police detective, testified that he was assigned to locate defendant during the investigation of Cornell's death. Detective Brass, aware that defendant's license had been suspended, spotted defendant driving a car. Detective Brass stopped defendant, at which time defendant produced a license with his own picture but with the name Hubert Davenport. At first, defendant denied that his name was Carter, stated that his name was Davenport, and claimed that Carter was his brother's name. Eventually, he admitted that he was Nathaniel Carter.

¶ 7    Defendant was taken to the police station. He agreed to talk, claiming that he was with his girlfriend on the night of the incident. According to defendant, they went to dinner and a movie and then spent the night at her house. Defendant denied going to 321 Lincoln, denied knowing "Cujo," and denied involvement in the murder. After defendant saw James being interviewed down the hall at the police station, however, defendant said that he knew James as a "crack head" but not as "Cujo." Defendant admitted knowing "Dayday" and asked the detective if David had said that defendant supplied the guns for the robbery. Defendant continued to deny involvement, but his story kept changing. Each version was different in terms of whether he and his girlfriend actually went to a movie, what time they ate, and whether his son came along. David had injured his ankle, and Detective Brass questioned defendant about this as well. Defendant relayed that he saw David a couple of days after the incident and that David told defendant that he had hurt his ankle when his girlfriend pushed him down a flight of stairs.

¶ 8    At some point during the interview, defendant again changed his story about being with his girlfriend. He admitted being at a motel with James and David when "they formulated a plan to do a robbery." James came up with the idea because he knew a place on Lincoln Avenue where there was a lot of money. They exited the motel room and went out on the balcony, and defendant jumped from the second-floor balcony into a truck bed below. Defendant then challenged David to do the same, which he did, although he injured his ankle. Dayday was still able to go with them, and he drove them to Lincoln Avenue in his car. Defendant knew that James had a gun, and James exited the car alone. James commented that " 'he was going to go handle his business,' " which meant doing a robbery. Defendant and David stayed in the car for a few minutes before hearing gunshots. They took off, drove around the block, and saw a black male lying in the street. They drove away. Defendant then

returned to his girlfriend's house and did not know what happened to David or James.

¶ 9    On cross-examination, Detective Brass admitted that his report did not say that defendant planned or conspired to commit a robbery with James and David. However, defendant told the detective during the interview that he was willing to participate in the robbery at the house on Lincoln. The interview began at 7 p.m. and ended around 5:45 a.m. The interview was not continuous during that period, and it was not videotaped. Detective Brass did not ask defendant for a written statement.

¶ 10    Rockford police detective Howard Forrester, who continued interviewing defendant after Detective Brass, testified that defendant gave three different versions of events. At first, defendant claimed that he was with his girlfriend and kids on the night of September 30 to October 1, eating and watching videos. Then, he changed his story and stated that he was at the Rockford Motel with David in James's room on September 30. Around 5 p.m., when they left, defendant jumped off the balcony into the bed of a truck, and David followed him and injured his ankle. After that, defendant picked up his girlfriend, and they ate and rented some videos. Later, David picked defendant up in his car, and they parked on Heath Street, which was adjacent to Lincoln. Defendant did not give details about time or what they were doing on Heath Street.

¶ 11    Detective Forrester testified that defendant then changed his story again, claiming that after the three left the motel, he and David drove to Heath Street but James did not come along; he did not know where James went. Defendant heard one gunshot and they drove to Lincoln and saw a body in the middle of the street. At that point, David drove defendant back to his car, around 4 a.m., and defendant drove to his girlfriend's house. With respect to the gun, defendant said that on October 1 he went to the Rockford Motel and saw James cleaning a .38-caliber revolver. James put it in a paper bag and gave it to defendant, who then took it to David's apartment. Detective Forrester's interview of defendant lasted until about noon. Detective Forrester did not ask for a written statement, because defendant's story jumped around so much and he eventually asked for a lawyer.

¶ 12    Angela testified that she met defendant through James and had known him for about two years. Angela had a sexual relationship with defendant for 1½ years, which James knew about. James and defendant were friends, and defendant called James "Cujo." Around the time of the incident, Angela, James, and their daughter had moved into the Rockford Motel for a few days. James and Angela, who was pregnant, were crack cocaine users at the time.

¶ 13    On September 30, when she and James went out to eat, "some lady" asked for a ride home and offered to pay them. The lady got in the car and asked where she could get some "good dope." James drove to a drug house on Lincoln, which was run by someone named Leroy. Angela recalled that defendant had had problems with Leroy, had "gotten him before," and "talked about getting him again." The lady and James got out of the car, went up to the house, and then returned to the car with drugs. After that, they all went back to the motel and smoked the crack cocaine; Angela took "one hit." Eventually, two other people stopped by, Goldie and Tim, who gave the lady a ride home.

¶ 14    Angela testified that a few hours later defendant and David arrived at the motel. They talked for one or two minutes and then went into the bathroom with James, closed the door,

and turned on the fan. Angela did not know what they discussed; they were in there about 15 minutes. When they came out, James said to defendant, " 'so should I just be a customer or what.' " Defendant told James to be quiet, that they would talk about it later. Then, they sat down and had some drinks. Defendant said that, if they were going to do something, they should go. Angela asked where they were going, but they did not tell her. When leaving, defendant and David jumped off the balcony into a pickup truck. When David jumped, he hit his "behind." They left around 3 or 3:30 a.m. in a small, black, four-door car, with David driving.

¶ 15 Angela further testified that, about 45 minutes later, James returned with a thin, black male. James told Angela to give the man a couple of dollars for giving James a ride home. After the man left, James seemed "very nervous, very paranoid." He removed a revolver from his waistband and told Angela that they had to get rid of it. James could not figure out how to get the bullets out of the revolver, however. Angela explained how to remove the bullets, and James wiped off the gun. Angela testified that James put the bullets in Angela's purse and the gun in a brown paper bag. Later, Angela said that the paper bag also contained the bullets.

¶ 16 According to Angela, defendant arrived at the motel 15 to 20 minutes later. At first, defendant acted normal. Then, he seemed "very hyper." Defendant said, " 'Cujo (James), where were you, we waited for you, we couldn't find you anywhere. We stuck around as long as we could.' " They discussed what had happened that night. Defendant said that he grabbed Cornell from behind, started hitting him with his gun, got him on the ground, and then yelled at James for not coming over to help him. Defendant said that he could not hold Cornell down and grab his "pack" at the same time. Angela explained that a "pack" was a "bag full of dope that usually sticks in your crotch." Defendant felt Cornell's pack, which he compared to a round ashtray in the motel room. According to defendant, Cornell broke free and started running, so defendant fired two shots. Cornell ran toward James. Because James did not know where the gunshots came from, James then fired. James told defendant that he wanted to get rid of the gun in the paper bag, and he gave it to defendant. Defendant left with the gun and then returned to the motel room to spend the night.

¶ 17 Angela testified that a few days later the police came to the motel room and arrested James. When they questioned her, she denied any knowledge of the incident. She responded in this fashion because James taught her to never talk to police. Two days later, the police contacted her again and brought her to the police station under the suspicion that she knew about the incident. Angela admitted that a forgery case was pending against her. The State, however, had not promised her anything in exchange for her testimony.

¶ 18 On cross-examination, Angela admitted that she had two additional "hits" of crack cocaine on the night of the incident. Angela explained that James and the lady they picked up had gone back to the drug house for more crack cocaine before the incident. When Goldie and Tim came over, they brought a revolver, which was the same gun that she saw James unload later. Angela never saw Goldie give the gun to James, but it was the same gun. After Goldie and Tim left with the lady, they came back later that night. Angela admitted that her written statement to police did not say anything about James pretending to be a customer; she remembered that detail eight months later. Angela was scared of James because he beat her

almost daily. Angela did not want to testify against defendant, and she was not trying to protect James.

¶ 19        Lashanna testified that she had a child with Cornell and also worked with him. Cornell picked up Lashanna at her apartment around 3:15 or 3:30 a.m. on October 1. He was driving his burgundy Grand Prix. They drove around listening to music and then Cornell stopped at a house on Lincoln to use the bathroom. He backed into the driveway of the house. Because the door on the driver's side of the car did not open, Lashanna got out of the car so that Cornell could exit on the passenger side. Lashanna got back in the car and moved to the driver's side. While she was waiting for Cornell, after about 10 to 15 minutes, she heard a gunshot. Then, she saw someone in front of the car, who came around and opened the passenger door. At first, Lashanna thought it was Cornell, but it turned out to be a white man who put a gun to her head and told her to shut up. He gave her three choices: get killed, drive him wherever he wanted to go, or get out. Lashanna wanted to get out, and the man pulled her out of the car. The man, whom she had never seen before, drove away in Cornell's car. Lashanna was screaming and crying and saw Cornell lying on the ground; she heard him crying her name. A car stopped on Lincoln and gave her a ride to a nearby cousin's house. Lashanna did not call the police, because her cousin did not have a phone. She went to the police station later that day and provided a written statement.

¶ 20        Berunica Boose testified that she lived in an apartment with David and her kids and had known defendant for years. On October 1, around 4 or 5 a.m., David showed up at the apartment "looking crazy" and scared, and his leg was "messed up." Berunica took him to the hospital. Later that day, Berunica's cousin called her to say that Cornell had been killed. At some point, Berunica needed to use David's car and she asked David if there was anything in it. David told her to "get the guns from under my car." Berunica looked under the hood of the car and saw three guns: one in a paper bag, one in a mask, and one wrapped in something that she did not recognize. Berunica carried the guns into the apartment and put them under her mattress. Defendant came over later that day, carrying a newspaper. He talked to David in the bedroom for a few minutes and then left. He was not carrying anything when he left. Afterward, Berunica looked under the mattress and saw only two guns; she did not know what happened to the third gun. Berunica admitted that friends of David's other than defendant had also stopped by that day.

¶ 21        Rockford police detective Joseph Stevens testified that on October 3 he was sent to Berunica and David's apartment based on an anonymous call relaying that it contained several handguns related to the investigation of Cornell's death. Berunica consented to a search for weapons, and David was also present. In the back bedroom, underneath the mattress, Detective Stevens found a black ski mask with a gun inside of it. The gun was fully loaded. He also found a brown paper bag that contained a .38-caliber revolver, two live bullets, and one spent bullet. David, who had either a broken leg or a broken ankle, was taken to the police station.

¶ 22        Russell McClain, a firearms ballistics examiner with the Illinois State Police, testified about his testing of a .38-caliber gun and a fired cartridge case that were found in the paper bag at David's apartment. He also tested the bullet that was recovered during Cornell's autopsy. The .38-caliber gun fired the bullet that was recovered from Cornell's body.

¶ 23    Rockford police detective James Barton testified that he tested the brown paper bag for prints. The print on the bag matched the print of defendant's right palm. Detective Barton also investigated the crime scene. In the yard of the house on Lincoln, Detective Barton found three small packets of rock cocaine near a grassy area where there appeared to have been a scuffle.

¶ 24    Rockford police detective Paul Triolo found Cornell's body lying in the street. Cornell had abrasions below his eye and on his lip, cheek, and stomach. He also had a gunshot wound to his upper left chest. His pants had grass strains and his zipper was unzipped. There was nearly $300 cash in his pocket and a can of tobacco.

¶ 25    Dr. Blum, a forensic pathologist, conducted an autopsy of Cornell's body. From a gunshot wound in the left chest area, he removed one bullet, which was the cause of Cornell's death. In Dr. Blum's opinion, the gun was fired within two feet of Cornell's chest. In addition, Cornell's head, hands, and knee showed multiple areas of blunt force injury, which could have been caused by someone striking him with a gun or a fist.

¶ 26    Rockford police detective David Cone testified on behalf of the defense regarding his questioning of Angela. Detective Cone interviewed her at the Rockford Motel on October 4. Angela relayed that neither she nor James was currently using drugs and that she was not aware that James was in any trouble. A search of the room revealed narcotics paraphernalia, and Angela responded that James must be using drugs again without her knowledge. The next day, October 5, Angela was informed that James had been charged with murder and that it was suspected that Angela was not being completely truthful. Angela admitted that she had been untruthful and agreed to come to the station, where she provided a written statement. Angela indicated that she had talked to James before giving the written statement.

¶ 27    During deliberations, the jury requested the police reports of Detectives Brass and Stevens and the photographs of Cornell's car. The jury was not given the police reports but it was given the pictures. In addition, the jury asked for the transcript of Detective Brass's testimony, stating that "otherwise, it was deadlocked." The jury received that testimony. After deliberating for 12 hours, the jury found defendant guilty of first-degree murder. The trial court sentenced defendant to 45 years' imprisonment.

¶ 28                              B. Posttrial Proceedings

¶ 29    Defendant appealed, raising only one issue: whether the trial court erred by refusing to tender a proposed jury instruction that Angela's testimony might have been influenced by her pending forgery charge. This court rejected that argument and affirmed defendant's conviction. See *Carter*, No. 2-01-1336.

¶ 30    On January 20, 2004, defendant filed *pro se* a petition for postconviction relief based on claims of actual innocence and ineffective assistance of appellate counsel. The trial court ruled on defendant's petition on April 8, 2004, determining that it stated the gist of a constitutional claim. Counsel was appointed to represent defendant.

¶ 31    Defense counsel then filed several amended postconviction petitions, which culminated in a fourth amended postconviction petition. The fourth amended petition, dated January 17, 2006, alleged that trial counsel was ineffective on four grounds. It also included a claim of

actual innocence, based on James's affidavit, dated December 3, 2002, which stated that defendant had nothing to do with the crime and was not present when it occurred. In his affidavit, James averred that he told Angela to lie for him and implicate defendant so that he could avoid being held responsible for the crime.

¶ 32     The State moved to dismiss defendant's petition. Regarding defendant's claim of actual innocence, the State argued that James's affidavit was "inherently unreliable" because he was a codefendant who pled guilty to the crime.

¶ 33     After numerous continuances, the trial court issued a memorandum of decision on September 11, 2006, dismissing defendant's fourth amended postconviction petition in its entirety. With respect to James's affidavit, the court agreed that it was unavailable at the time of trial because James could have exercised his fifth amendment right against self-incrimination. However, it was not evidence that would likely change the outcome of the trial. The court reasoned that, although James's affidavit contradicted Angela's testimony implicating defendant, the State's case was not based upon her testimony alone, in that the State called 11 witnesses to testify. Moreover, the defense cross-examined Angela on the issue of whether she was falsely implicating defendant in order to protect James, meaning that James's affidavit was cumulative on an issue that was already explored at trial and rejected by the jury. Also, as part of the evidence establishing defendant's guilt, the jury heard about the statements defendant gave to detectives admitting that he was in the car in front of the house when Cornell was shot.

¶ 34     Defendant appealed the dismissal of his fourth amended postconviction petition, arguing that the trial court erred by not giving him an evidentiary hearing on his claims. As stated, this court affirmed the dismissal of all of defendant's postconviction claims except for the one that alleged actual innocence. This claim centered on James's affidavit, which stated:

> "I'm making this statement on behalf of [defendant]. I murdered Cornell Thomas while high on crack-cocain [sic]. I did not plan on committing this crime, but I was high at the time. [Defendant] did not in anyway have anything to do with this crime. [Defendant] did not assist me in anyway in the planning in any of my actions involving the victim in this case. I informed my wife Angela Hackler to lie for me by implicating [defendant] in this case to help me avoid being held responsible for the crime. Later on I pleaded guilty to forty-two (42) years for my wrong doing in the Cornell Thomas murder. I was totally alone when this murder occurred."

James further stated in his affidavit that "if my testimony is required regarding the above, I would be willing to do so."

¶ 35     In advancing this claim, defendant argued that the trial court judge handling his postconviction proceedings was not the same judge who presided over his trial, meaning that he was "at something of a disadvantage" in seeing how James's testimony would have affected the trial. Defendant also pointed out that the jury made several requests during its deliberations, indicated that it was deadlocked at one point, and deliberated 12 hours before returning a verdict. Last, defendant argued that the evidence against him was far from overwhelming. The State responded that James's affidavit was cumulative on an issue already explored and rejected by the jury; namely, whether Angela was falsely implicating

defendant in order to protect James.

¶ 36     Although we agreed with the State that James's affidavit was cumulative on the issue of Angela's credibility, we also agreed with defendant that the affidavit was so conclusive that it would likely change the result of defendant's trial. *Carter*, No. 2-06-1012, slip order at 28. Reasoning that the evidence against defendant was not overwhelming, and that James's affidavit completely exonerated defendant in the planning of the actions, *i.e.*, the robbery, that resulted in the killing of Cornell, we determined that defendant was entitled to an evidentiary hearing on his claim of actual innocence. *Id.* at 29-30. We thus remanded the case for that hearing.

¶ 37                         C. Third-Stage Evidentiary Hearing

¶ 38                                1. James's Testimony

¶ 39     The evidentiary hearing commenced on October 19, 2010. James, who never testified at defendant's trial, was the first witness to testify. Prior to his testimony, the State advised the court that, depending on the content of James's testimony, it could charge him with lying to the police. James was not currently represented by counsel, and, according to the State, his appeals were "done," and he had no pending petitions. The court admonished James that the State could file charges against him based on his testimony, and James elected to testify.

¶ 40     James testified that he pled guilty to Cornell's murder, which occurred during the early morning hours of October 1, 2000. According to James, defendant did not plan the robbery or the murder of Cornell and was not present when James killed Cornell.

¶ 41     James testified about the events leading up to Cornell's death. James was staying in a motel room with Angela and his daughter. At that time, James used crack cocaine daily. He was getting high when defendant and David came to the motel room. James explained that the house on Lincoln was a "dope" house. James planned to buy more drugs; he did not plan to rob anyone. James asked David for a ride, and the three left the motel room.

¶ 42     When they left, James walked down the stairs but defendant jumped over the second floor balcony. David also jumped over the balcony and injured himself in the process. They left in David's car. David drove; defendant sat in the passenger seat; and James sat in the backseat getting high. David dropped defendant off at his girlfriend's house. Then, David and James went to the dope house on Lincoln. David said that he did not want to go directly in front of the house in case it was being watched by police, so they parked on the other side of the block. James walked up to the house and knocked on the door, but no one answered. As James walked away, a Monte Carlo backed into the driveway, and James hid behind a tree. A man exited the car, and James thought he was "coming towards" him. James, who had a gun, a ".38 special," told the man to freeze and get on his knees. The man did, and James hit him in the face with his gun to show him he "meant business." The man wanted to fight, and they wrestled. As James continued to pistol whip him, the man grabbed the gun, and it went off. James patted the man's pockets but there was nothing there; James did not go through his pockets or reach into his pants.

¶ 43     James then saw that someone else was in the Monte Carlo. He opened the car door and told a "heavyset" black female not to look at him and to take the keys out of the ignition. She

complied. James then saw someone running in his direction, and he assumed it was the man from before. James shot once at the man and then watched him run around the corner; James did not think he hit him. Next, James told the female to get out of the car. The driver's door would not open, however, so he grabbed her by the hair and shirt and "flung" her to the ground through the passenger door. James then took the car and "stashed it" close to the Jane Addams projects. He walked down railroad tracks and got a ride from a man back to the motel. That man came up to his motel room for about five minutes because James had to give him some crack for giving him a ride.

¶ 44    Back at the motel, James testified, he got high again. He gave the gun to Angela and told her to remove the bullets, wipe off the fingerprints, and then put it in a brown paper bag. Defendant returned to the motel room about 90 minutes later and had some drinks. James did not tell defendant what happened at the dope house. Defendant gave James "a couple rocks," which he smoked. Angela was doing drugs too. At the time, Angela did crack cocaine with James every day. James did not tell Angela what happened until he "saw it on the news" the next day. James was arrested a few days later.

¶ 45    James gave a written statement to police shortly after the incident, on October 4, 2000. In his statement, James said that defendant and David came to his motel room and started talking about "doing Leroy's place." They all went into the bathroom because they did not want the "women" to hear. Defendant and David wanted James to act like he was buying drugs and then they would "rob them." Another man in the motel room gave James a gun, which he put in his waistband. They left and defendant jumped over the balcony. David did the same thing but hurt his leg. They drove to the house on Lincoln but David could not walk because of his injured leg. Defendant "said that he was just gonna do it by himself." James hesitated but then followed defendant, who already "had another black guy on the ground and he was smacking the guy in the face with a gun." Defendant was wearing a black ski mask.

¶ 46    James went on to say in his written statement that a Monte Carlo was backed into the yard. A "heavyset female" was sitting in the driver's seat. James told her to remove the keys from the ignition. Defendant kept hitting the man and asking " 'Where's it at?' " but the man said that he did not know. The man struggled to get up, and then James heard two shots. Next, the female told James that the driver's-side door did not open, so she climbed out the passenger side. The man ran off, and James drove away. James did not know that "anyone got shot." James parked the car near the projects and started walking. He then saw a man he knew from being "at dope spots," who gave James a ride back to the motel. James gave him $4 and a pack of cigarettes.

¶ 47    James continued in his written statement that he smoked some crack when he got back to the motel. About 20 or 30 minutes later, defendant also returned to the motel. By this time, James had put his gun in a paper bag, which he gave to defendant. Defendant said that the man at the house on Lincoln would not tell him where the packs were, that the man grabbed the gun or his hand and started to fight with him, and that this was when the gun went off. Defendant thought that the man "got hit."

¶ 48    James testified that his written statement was not true. James made the statement because defendant was a "known drug dealer," and James did not want to get in trouble. Also, people

knew that defendant was with James prior to Cornell's death; the police had James in a little room for 16 hours without food or drink; and James had been doing drugs for four days straight. In addition, the police added things to his statement that he did not say. After giving the statement, James was put in jail. From jail, he called Angela and told her to blame everything on defendant and David so that he would be released.

¶ 49    Prior to going to the house on Lincoln, James, David, and defendant went into the bathroom to discuss having sex with Angela, who was a known prostitute. Defendant was going to get Angela high so that they could have sex with her, which they had done before.

¶ 50    On September 26, 2001, James pled guilty to killing Cornell. On December 3, 2002, he prepared his affidavit stating that defendant had nothing to do with the murder. At this point in his testimony, the court asked James what prompted him to write the affidavit. James answered that he "was caught" and "in prison." According to James, there was no event or communication from anyone that prompted him to prepare the affidavit; he prepared it on his own initiative.

¶ 51    On cross-examination James testified that, when he pled guilty, he listened to the prosecutor state the facts of the case. James never corrected the prosecutor by stating that defendant was not involved in the incident. James did not care what happened to defendant at the time, but he cared now because he was "trying to do the right thing."

¶ 52                                    2. Angela's Testimony

¶ 53    Angela testified on behalf of the State as follows. Though she did drugs when she was married to James, she had been sober for the past four years. After defendant's trial, Angela was approached by "Dimp," defendant's relative whose real name was Hubert Davenport, on July 26, 2001. He came to her house at 6:45 a.m. and said that he was upset about her testimony in defendant's case. Hubert asked Angela to write a letter saying that her testimony was wrong and that defendant had nothing to do with the incident. Angela typed and signed a letter that day, stating:

    "I was threatened and coerced into testifying against [defendant] at his trial. A leading detective in the case threatened to take my children and put me in jail if I didn't testify against [defendant]. [Defendant] did not murder [Cornell]. I did not know what went on the evening of the incident, nor am I sure of what happened after. I am writing this now because I feel it is complete unfair and wrong that [defendant] is being charged for a crime he did not commit. I believe he is being falsely accused."

¶ 54    Angela testified that the letter, which was also notarized, was not true. She signed it because Hubert threatened to hurt her children and her husband Larry.[1] Hubert said that they " 'could be taken care of very easily. The police weren't going to be able to do anything about it.' "

¶ 55    On August 2, 2001, Angela gave a written statement to police explaining the July 26,

---

[1]In July 2001, Angela was still married to James, although she filed for divorce on November 15, 2001, and then married Larry.

2001, letter. Angela stated the following in the August 2, 2001, written statement. Her June 2001 testimony at defendant's trial was truthful. On July 26, 2001, Hubert came to her house to talk about helping defendant. Angela was aware that James, not defendant, killed Cornell. However, defendant "was there" and "had something to do with it." Hubert told Angela that she needed to help defendant, threatening that the police could not protect her or Larry. When Hubert came to her house, he called defendant's mother, Mattie Harris, so that she could talk to Angela. Mattie told Angela that defendant was not mad at her and that defendant wanted Angela to have his Bronco and anything her kids needed. Mattie wanted Angela to write a letter saying that she had been threatened by detectives. Angela told Hubert that she did not want to write the letter, but Hubert insisted. She wrote the July 26 letter only because she feared that Hubert would hurt her or her children. Hubert came back to the house to pick up the letter, and he also wanted her to talk to defendant's public defender.

¶ 56    Angela further said in her written statement that Barb Stone from the State's Attorney's office called her about James's upcoming trial. When Stone called, Angela told her about the letter she gave to Hubert. After that, Detective Cone called about the letter. At that time, Angela provided the August 2 written statement.

¶ 57    Angela further testified that she filed for divorce from James on November 15, 2001, based on mental and physical cruelty. They were divorced on July 11, 2002. Years later, in 2008, Angela appeared in court for a visitation hearing. Angela was ordered to bring her oldest child, Ashley, to the jail to visit James, which she did in October 2008. It was a "contact visit" in which she and James were seated across a table from each other, with other visiting families in the room. Ashley was seated between them.

¶ 58    During the visit, James told Angela that he had a plan to sign an affidavit taking entire responsibility for the crime so that defendant could go free. James said that he and defendant had been corresponding. When Angela responded that he should not be corresponding with defendant, James continually told her to be quiet so that the guards would not hear. James wanted defendant to "get out" in order "to take care of" Larry. Then, Angela would be "free to come down there and be with him." If that did not work, then Angela would be taken care of as well, and James would have their children to himself. James said this in front of Ashley, but in a voice soft enough that the guards could not hear him. At the next court date, Angela advised the judge about what James said. In addition, Ashley told her guardian *ad litem*, Kimberly Timmerwilke, but nothing was done.

¶ 59    At this point in Angela's testimony, defense counsel objected and asked that Angela's testimony be stricken. According to defense counsel, he never received notice of: (1) Angela's August 2001 written statement; (2) Angela's statements in court about James's threats; or (3) Ashley's conversation with Timmerwilke. The State explained that Angela's August 2001 written statement was not part of defendant's file but was part of the file in the case against Hubert.[2] In addition, there was no transcript of the visitation hearing in which Angela advised the court that James had threatened her in the jail. The court denied defense

---

[2]Hubert was charged with harassing a witness for contacting Angela. Angela's written statement was prepared in conjunction with that investigation.

counsel's request to strike Angela's testimony. However, the court continued the case so that counsel could put his motions in writing. Defense counsel indicated that he wanted to speak with Ashley, Stone, and Timmerwilke.

¶ 60    At the next court date, the parties advised the court that there were no transcripts of the hearing in which Angela reported James's threats. In addition, the court was advised that Timmerwilke had written a letter to James's attorney, dated November 11, 2008. The State had provided Timmerwilke's letter to defense counsel. Timmerwilke's letter stated that she met with Ashley and Angela on November 6, 2008. During that meeting, Ashley stated that "her father [James] threatened to kill her step-father [Larry] so that her mom [Angela] would come back to her father [James] and if that did not work, he [James] would kill her mother [Angela] and then he [James] would have the two children all to himself." The letter further stated that Angela "confirmed the events at the jail." Defense counsel advised the court that Timmerwilke refused to speak with him, so he released her from a subpoena. In addition, defense counsel advised the court that he had spoken with Ashley. Defense counsel again moved to strike certain portions of Angela's testimony, and the court denied this motion.

¶ 61    The questioning of Angela resumed. Angela testified that she told Timmerwilke of her visit with James at the jail and his plan to sign an affidavit taking the entire blame for Cornell's murder so that defendant could go free and kill Larry. Ashley communicated this same information to Timmerwilke.

¶ 62    On cross-examination, Angela testified that she wrote the July 26, 2001, letter in hopes of receiving the Blazer or money from defendant's family, and also because she felt threatened. She could not remember if Hubert told her what to say in the letter.

¶ 63                    3. Detective Bruno

¶ 64    Detective Eric Bruno testified regarding his October 4, 2000, interview of James at the police station after Cornell's death. At first, James did not want to give a written statement because he said he could hear defendant being interviewed in another room. The police asked James if he wanted to see defendant, and both defendant and James were brought into the hall. The two looked at each other for a few moments but did not speak. After that, James provided a written statement. Detective Bruno typed as James "was going through the story," and then he handed James a printed version. James made a couple of corrections, which he initialed before signing the written statement. Nothing was added to the statement; it was in James's words. During the interview, James asked for food, drinks, cigarettes, and a bathroom break. All of this was given to him.

¶ 65    On cross-examination, Detective Bruno testified that James had been in custody about seven hours when he provided the statement.

¶ 66                    4. Rebuttal Witnesses

¶ 67    On rebuttal, James admitted that Angela and Ashley visited him in jail in October 2008. However, James denied telling Angela and Ashley that he planned to write an affidavit taking all responsibility for the crime, get defendant out of prison, and have defendant kill

Larry. James admitted telling Angela "a long time ago that [he] did sign an affidavit." In the affidavit, dated December 3, 2002, James took full responsibility for the crime and denied any involvement by defendant.

¶ 68 Hubert was also called as a rebuttal witness. After defendant's trial, Angela called defendant's mother, Mattie, who then called Hubert. After that, the family talked to defendant's "postconviction attorney," who came to Mattie's house. The attorney gave Hubert authorization to talk to Angela, because it was after defendant's trial. A couple of days later, Angela called Hubert to tell him that she would be signing a letter and to come pick it up. Angela knew Hubert through his godsister, Kylas Glaze, who was a friend of Angela's. Hubert then went to Angela's house early in the morning, picked up the letter, and gave it to defendant's attorney. Hubert denied threatening Angela to write the letter, though he was later charged with harassing a witness. He also denied offering Angela a bribe of a Blazer or money to write the letter. Hubert pled guilty to the harassment charge because he was on parole, which resulted in him being arrested and "locked up." Hubert admitted having prior convictions of drug offenses and being on parole for armed robbery.

¶ 69 Mattie testified last. Mattie spoke twice with Angela on the phone and asked Angela to write a letter on defendant's behalf. Mattie asked Angela to write a letter because Mattie's goddaughter, who watched Angela's children, told Mattie that Angela was not her "normal self" during defendant's trial and that Angela had said that she had been "threatened" about losing her children if she did not testify. Angela told Mattie that she would do what she could to help defendant. The idea of having Angela prepare a letter came from the attorney who visited Mattie's house and whom the family considered hiring on defendant's behalf. They did not end up hiring the attorney, because he was too expensive; Mattie could not remember his name. Mattie never threatened Angela or offered to give her a Blazer or money; she was not financially able to do so.

¶ 70 The trial court denied defendant's postconviction petition on July 1, 2011. In its memorandum of decision, the court made numerous findings. Regarding Angela, the court found as follows. Angela's testimony at defendant's trial was "consistent and credible"; her letter/affidavit subsequent to her trial testimony was "not credible"; her testimony at the evidentiary hearing was "credible and consistent in that she was induced or influenced to sign the affidavit, based on her belief that she would be retaliated against if she didn't sign the affidavit exculpating" defendant, but that the affidavit was "untrue"; and at the evidentiary hearing "her manner and demeanor while testifying was sincere, plausible and credible." Conversely, the court found James's "testimony in this cause to be entirely incredible in every respect." According to the court, the "content" of James's testimony was "incredible" and his "manner while testifying lacked credibility." The court found that the "sequence of events purportedly underlying James Hackler's coming forward and giving testimony to exculpate" defendant was "entirely incredible." Specifically, the court found that James's testimony was "illogical and improbable in light of all the other evidence in the case," and the newly discovered evidence of actual innocence was "entirely improbable, implausible and incredible in every respect."

¶ 71 Defendant timely appealed.

¶ 72                                    II. ANALYSIS

¶ 73       Defendant makes two arguments as to why the trial court erred by not granting him a new
trial after the third-stage evidentiary hearing. First, he argues that the trial court usurped the
role of the jury in finding that James's testimony was incredible. Second, defendant argues
that, even if the trial court properly assessed James's credibility, its denial of a new trial was
manifestly erroneous because James's testimony was not materially impeached by the State.

¶ 74       Under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2004)),
individuals convicted of criminal offenses may challenge their convictions based on
constitutional violations. *People v. Domagala*, 2013 IL 113688, ¶ 32. Such violations include
freestanding claims of actual innocence, based on newly discovered evidence. *People v.
Brown*, 2013 IL App (1st) 091009, ¶ 50. The Act provides a three-stage process for
adjudication of postconviction petitions (*People v. English*, 2013 IL 112890, ¶ 23), and, here,
this court remanded the case for a third-stage evidentiary hearing on defendant's claim of
actual innocence (see *Carter*, No. 2-06-1012). At a third-stage evidentiary hearing, "the
circuit court serves as the fact finder, and, therefore, it is the court's function to determine
witness credibility, decide the weight to be given testimony and evidence, and resolve any
evidentiary conflicts." *Domagala*, 2013 IL 113688, ¶ 34. "After an evidentiary hearing where
fact-finding and credibility determinations are involved, the circuit court's decision will not
be reversed unless it is manifestly erroneous." *English*, 2013 IL 112890, ¶ 23.

¶ 75       For new evidence to warrant a new trial, the evidence must: (1) be of such conclusive
character that it will probably change the result on retrial; (2) be material to the issue, not
merely cumulative; and (3) have been discovered since trial and be of such character that the
defendant in the exercise of due diligence could not have discovered it earlier. *Brown*, 2013
IL App (1st) 091009, ¶ 50. New evidence need not necessarily establish the defendant's
innocence. *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1034 (2011). Instead, a new trial is
warranted if all of the facts and surrounding circumstances, including the new evidence,
warrant closer scrutiny to determine the guilt or innocence of the defendant. *Id.* Requests for
a new trial based on newly discovered evidence are not looked upon with favor by the courts
and must be closely scrutinized. *Id.*

¶ 76       At the outset, we note that well-established case law runs counter to defendant's
argument that the trial court should not have independently determined that James's
testimony was not credible (and that Angela's testimony was). In third-stage evidentiary
hearings, as our supreme court has noted, issues can involve either credibility and factual
determinations or pure questions of law, where no new evidence is presented. See *English*,
2013 IL 112890, ¶ 23; *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). The standard of review
to be applied depends on the nature of the issue presented: credibility and factual
determinations will not be reversed unless they are manifestly erroneous, and pure questions
of law are reviewed *de novo*. *English*, 2013 IL 112890, ¶ 23; *Beaman*, 229 Ill. 2d at 72.

¶ 77       The purpose of the third-stage evidentiary hearing in this case was to determine whether
the new evidence was of such conclusive character that it would probably change the result
on retrial. In order to make this determination, the trial court was required to assess the

credibility of James and the other witnesses. Our supreme court has described the role of the trial court as follows: "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Domagala*, 2013 IL 113688, ¶ 34; see also *Gonzalez*, 407 Ill. App. 3d at 1036 ("Credibility determinations such as this [at a third-stage evidentiary hearing] are properly made by the trier of fact, and we have no basis in the record for second-guessing the trial court's judgment."). Therefore, we disagree that the trial court somehow exceeded its bounds by discrediting James's testimony and crediting Angela's testimony. Indeed, the trial court's role, in determining whether defendant was entitled to a new trial after the evidentiary hearing, was to weigh the witnesses' testimony, make credibility determinations, and resolve conflicts in the evidence.

¶ 78    In support of his position that the court should not have itself determined James's credibility, defendant relies on three cases: *People v. Ortiz*, 235 Ill. 2d 319 (2009); *People v. Molstad*, 101 Ill. 2d 128 (1984); and *People v. Washington*, 256 Ill. App. 3d 445 (1993), *aff'd*, 171 Ill. 2d 475 (1996). Under these cases, defendant argues, the trial court's task, at most, was to make "a preliminary determination of whether a reasonable fact-finder could believe" James at a new trial. We disagree and discuss each case in turn.

¶ 79    In *Ortiz*, the defendant raised a claim of actual innocence in a successive postconviction petition. The newly discovered evidence consisted of an eyewitness, Hernandez, coming forward 10 years after the incident and denying that the defendant had anything to do with the beating or shooting of the victim. *Ortiz*, 235 Ill. 2d at 326. The trial court granted a third-stage evidentiary hearing but then determined that Hernandez's testimony was insufficient to warrant a new trial. *Id.* at 327. The trial court made no findings regarding Hernandez's credibility but merely found that his testimony was cumulative of that of two other eyewitnesses. *Id.* at 334-35.[3] The two eyewitnesses had given statements to police implicating the defendant in the incident and then recanted those statements. *Id.* at 323-34. The supreme court determined that the trial court's finding that Hernandez's testimony was cumulative of the testimony in which the two eyewitnesses recanted their statements was manifestly erroneous. *Id.* at 336. The court reasoned that "[t]he fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts." *Id.* at 337.

¶ 80    While defendant cites *Ortiz* for the proposition that "it is not the function of a postconviction court to make the ultimate determination of a defendant's guilt or innocence; that function is for the finder of fact at a new trial," this is not a fair reading of *Ortiz*. In *Ortiz*, the trial court denied the defendant a new trial on the sole basis that Hernandez's testimony was cumulative; the court did not make a credibility determination as to whether it was of such conclusive character that it would probably change the result on retrial (the prong of the test for a new trial at issue here). Therefore, to read *Ortiz* as a restriction on the trial court's ability to make credibility determinations or resolve conflicting testimony is

---

[3]As stated above, whether new evidence is cumulative is one of the prongs of the test for granting a new trial.

inaccurate. Though the trial court could have assessed Hernandez's credibility, as stated, it denied the defendant a new trial on the basis that his testimony was cumulative.

¶ 81　　The second case relied on by defendant, *Molstad*, did not involve a postconviction petition (or third-stage evidentiary hearing) but rather a posttrial motion before sentencing. At the defendant's trial for aggravated battery and criminal damage to the victim's car, the victim's girlfriend testified that she saw the defendant striking the back window of the car. *Molstad*, 101 Ill. 2d at 131. Prior to sentencing, the defendant's attorney filed a posttrial motion to either reopen the case or obtain a new trial based on the affidavits of five of the defendant's codefendants stating that the defendant had not been present at the time of the attack. *Id.* at 132. The trial court denied that motion without conducting an evidentiary hearing. See *People v. Molstad*, 112 Ill. App. 3d 819, 821 (1983) (appellate court explaining procedural history of case). The supreme court held that the trial court abused its discretion by denying the defendant's motion for a new trial to consider the newly discovered evidence. *Molstad*, 101 Ill. 2d at 136-37. With respect to the new evidence, the supreme court stated that "this does not mean that [the defendant] is innocent, merely that all of the facts and surrounding circumstances, including the testimony of the codefendants, should be scrutinized more closely to determine the guilt or innocence" of the defendant. *Id.* at 136.

¶ 82　　Defendant argues that the above-quoted statement in *Molstad* is consistent with the final prong of the test for granting a new trial, which is that the evidence must be of such conclusive character that it will *probably* change the result on retrial. While defendant's statement is correct, there is nothing in *Molstad* limiting the trial court's ability to assess witnesses' credibility or resolve conflicting testimony in making this determination. In other words, the trial court may assess the credibility of new witnesses or conflicting witnesses to determine whether the new evidence is of such conclusive character that it will probably change the result on retrial. Again, the trial court in *Molstad* did not make credibility assessments (it did not even conduct an evidentiary hearing), not because it could not, but because it so chose.

¶ 83　　Last, in *Washington*, the defendant filed a postconviction petition based in part on the testimony of a witness named Martin who implicated someone other than the defendant in the murder of the victim. *Washington*, 256 Ill. App. 3d at 446. The court conducted an evidentiary hearing and granted the defendant a new trial on the basis of this evidence. *Id.* at 447. The appellate court affirmed, stating that, although the trial court was *not required* to make an initial determination of Martin's credibility before deciding whether her testimony was of such conclusive character to probably change the result on retrial, as the State urged, it was "clear that the court found Martin credible for several reasons." *Id.* at 448. Once again, nothing in *Washington* bars a trial court from assessing a witness's credibility or resolving conflicts in the evidence in determining whether a defendant is entitled to a new trial.

¶ 84　　Regarding credibility determinations at a third-stage evidentiary hearing, this court's decision in *Gonzalez* is instructive. There, the defendant also claimed that the trial court erred by denying him a new trial after an evidentiary hearing on his claim of actual innocence. *Gonzalez*, 407 Ill. App. 3d at 1026-27. In denying the defendant's motion for a new trial, the trial court found the new witness's testimony incredible and " 'worthless.' " *Id.* at 1035. This

court distinguished *Molstad* on this basis, noting that, unlike the trial court in *Molstad*, which did *not* assess the new witnesses' credibility, the trial court in *Gonzalez* did assess the new witness's credibility. *Id.* Citing *Molstad*, this court reasoned that, although new evidence need not necessarily establish the defendant's innocence, it must establish a basis for closer scrutiny of the defendant's guilt. *Id.* at 1036 (citing *Molstad*, 101 Ill. 2d at 136). Because the new witness's testimony had not met that bar, however, the trial court's decision finding that the new evidence did not warrant a new trial was not manifestly erroneous. *Id.*

¶ 85    For all of these reasons, we reject defendant's argument that the trial court overstepped its role by independently assessing the credibility of James and the other witnesses and determining that defendant was not entitled to a new trial.

¶ 86    Defendant's second (and last) argument on appeal is that the trial court's decision denying him a new trial was manifestly erroneous. Specifically, defendant first argues that the State failed to impeach James in any meaningful manner and that he wrote the affidavit 15 months after his guilty plea, which was a "perilous time" when the appeals of his guilty plea were pending.

¶ 87    As we stated in response to defendant's first argument, it was up to the trial court to assess the witnesses's credibility and resolve conflicts in the evidence. Though James did not testify at defendant's trial, he did provide a written statement to police shortly after the incident, on October 4, 2000. However, James's testimony at the third-stage evidentiary hearing completely contradicted his written statement, causing the trial court to resolve this conflict and weigh the statement against his testimony. See *People v. Jones*, 2012 IL App (1st) 093180, ¶ 63 (generally, a witness's recantation of his or her testimony is viewed as inherently unreliable). In doing so, the trial court found that James's testimony was "entirely incredible in every respect," and that "his manner while testifying lacked credibility."

¶ 88    The trial court's credibility determination was supported by the evidence presented by the State, which, contrary to defendant's assertion, did impeach James's testimony regarding why his October 2000 statement was not true. In contrast to James's testimony that police added information to his October 2000 statement, kept him in a small room for 16 hours, and denied him food and drink, Detective Bruno testified that defendant was provided food, drinks, cigarettes, and a bathroom break. In addition, Detective Bruno testified that nothing was added to James's statement, which James initialed and signed.

¶ 89    Moreover, although James said that he wrote the affidavit when he was appealing his guilty plea, and thus had something to lose, by the time of the third-stage evidentiary hearing James's appeals had been resolved, and he had nothing (legally) at stake. More importantly, the trial court did not find credible James's reason for coming forward and writing the affidavit. Although James testified that he came forward because he was "caught" and "in prison" and was now trying to do the right thing, the trial court found the "sequence of events purportedly underlying" James's decision to come forward "entirely incredible."

¶ 90    In addition, also contrary to defendant's assertion, the State offered Angela's testimony to impeach James as to his real motivation for coming forward. Angela testified that, after she and James divorced in 2002, she was ordered in 2008 to visit James at the jail with Ashley. At the visit, James told Angela that he had been in contact with defendant and that

he wanted defendant to be released from prison so that he could "take care of" Larry. Then, Angela would be "free to come down there and be with him." If that did not work, Angela would be taken care of as well, and James would have the children to himself.

¶ 91    Regarding Angela's testimony, defendant argues that her testimony as to James's motivation for coming forward was "facially incredible" and not supported by Timmerwilke's letter to James's attorney, and he points out that this court noted that her testimony at trial had been strongly impeached by the defense.

¶ 92    Beginning with Timmerwilke's letter to James's attorney, defendant is incorrect in arguing that it did not support Angela's testimony. Consistent with Angela's testimony at the hearing, Timmerwilke's letter, which is part of the record, stated that she met with Ashley and Angela after their visit with James at the jail. During that meeting, Ashley stated that James had threatened to kill Larry and said that, if that plan did not work, then he would kill Angela so that he could have both children to himself. The letter further stated that Timmerwilke met with Angela, who confirmed Ashley's account of what transpired during the visit at the jail.

¶ 93    Timmerwilke's letter lends credibility to Angela's testimony regarding James's motivation for taking all the blame for Cornell's death. Though Timmerwilke's letter did not mention that James said that defendant would kill Larry, the letter was consistent with James's overall plan to get defendant out of prison so that he could "take care" of Larry and free up Angela to be with him. In addition, Angela testified that she told Timmerwilke that James's plan was to get defendant out of jail so that he could kill Larry. As previously stated, it was up to the trial court to assess Angela's credibility at the evidentiary hearing. The court found her testimony credible and consistent and her demeanor sincere, plausible, and credible. See *Gonzalez*, 407 Ill. App. 3d at 1035 (credibility determinations at a third-stage evidentiary hearing are properly made by the trier of fact, and we have no basis in the record for second-guessing the trial court's judgment).

¶ 94    The trial court also determined that Angela's testimony at defendant's trial was consistent and credible. In reaching this conclusion, the court considered Angela's testimony at the third-stage evidentiary hearing in relation to her testimony at defendant's trial. At the time of the evidentiary hearing, Angela had divorced James and been sober for four years. The evidentiary hearing occurred 10 years after the incident, and with the exception of the July 26, 2001, letter that she wrote after she was threatened by Hubert, Angela never denied defendant's involvement in the incident. The court was persuaded that Angela was induced or influenced to sign the July 26, 2001, letter, based on her fear of retaliation by Hubert. In addition, Angela's August 2, 2001, written statement to police explained why she wrote the July 26, 2001, letter and supported that her testimony at defendant's trial was true.

¶ 95    At defendant's trial, Angela testified that, after the incident, during James's and defendant's discussion of what happened, defendant admitted hitting Cornell with his gun and firing a couple of shots at him. James also admitted firing a couple of shots at Cornell. At the evidentiary hearing, Angela testified that, even though she was aware that James killed Cornell, defendant "was there" and "had something to do with it." Based on Angela's testimony at defendant's trial, her August 2, 2001, written statement to police, her testimony

at the evidentiary hearing, and Timmerwilke's letter, the trial court's credibility finding as to Angela was not manifestly erroneous.

¶ 96     Finally, defendant argues that the same trial court did not preside over his trial and his postconviction proceedings. While it is preferable to have the same court preside over both proceedings, the court in this case considered the trial transcripts and was able to assess the witnesses' credibility at the evidentiary hearing. For the reasons stated, we cannot say that the court's decision denying defendant a new trial on the basis of the newly discovered evidence was manifestly erroneous.

¶ 97                              III. CONCLUSION

¶ 98     For the foregoing reasons, the judgment of the Winnebago County circuit court is affirmed.

¶ 99     Affirmed.