2015 IL App (1st) 131938

THIRD DIVISION
October 21, 2015

No. 1-13-1938

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 02 CR 22859 |
| | ) | |
| CORNELL MORGAN, | ) | Honorable |
| | ) | Catherine M. Haberkorn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Cornell Morgan was convicted of attempted murder and aggravated battery with a firearm in connection with the shooting of Jarrett Garcia on December 26, 2001. He filed a *pro se* postconviction petition in which he raised three claims: (1) he had newly discovered evidence of his actual innocence, (2) his trial counsel was ineffective for failing to call character witnesses at his sentencing hearing, and (3) his appellate counsel (who also represented him at sentencing) was ineffective for failing to raise on appeal her own ineffectiveness at sentencing. Morgan attached an affidavit from eyewitness Annie Coleman, who claimed she saw someone else shoot the victim, and three affidavits from his character witnesses.

¶ 2     On the State's motion, the circuit court dismissed Morgan's ineffective assistance claims at the second stage of postconviction proceedings. Morgan's actual innocence claim proceeded to a third-stage evidentiary hearing. Following the hearing, the trial court found that Coleman's testimony was not credible and denied Morgan's petition. Morgan now appeals, contending

that: (1) the circuit court committed manifest error in denying his actual innocence claim; (2) the circuit court erroneously dismissed his ineffective assistance claim; and (3) his postconviction counsel violated Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) by failing to consult with him regarding his claims. Finding no error, we affirm.

¶ 3                                    BACKGROUND

¶ 4                                   Morgan's Trial

¶ 5        The case against Morgan proceeded to a jury trial before Judge Catherine Haberkorn. The State called three witnesses to the shooting: the victim Garcia, Loretta Megwa, and Berrisford Flowers.

¶ 6        Garcia testified that his brother Ean introduced him to Morgan in the summer of 2001. At the time, Garcia only knew Morgan as "Doo." The two of them came to a business arrangement: Garcia would store packages of marijuana for Morgan, and when Morgan came to pick up a package, he would give Garcia money and also some of the marijuana as payment. This arrangement continued through December 2001. Morgan gave packages to Garcia on about three occasions, and Garcia saw him in person about 10 times in total.

¶ 7        On December 25, 2001, Morgan called Garcia and told him that he was coming to pick up a package of marijuana. Garcia told him that he could not deliver the marijuana on that day, so Morgan said that he would come by the next day. In anticipation of Morgan's visit, Garcia placed one of Morgan's packages in his car, under the seat.

¶ 8        The next day, at around 1:30 p.m., Garcia returned home to his apartment at 1712 Estes Avenue. He parked his car in the parking lot behind the building and then walked up the stairs to his apartment. When he got inside, he looked out the window and saw a red Camry pull into the alley next to the parking lot. Morgan was the driver. He waved at Garcia. Garcia exited his

apartment, came downstairs, grabbed the package from his car, put it inside his coat, and walked toward Morgan, who was still in his car.

¶ 9     When Garcia was about 12 feet away from Morgan's car, Morgan pulled out a gun and began shooting at him. Morgan did not say anything, nor did Garcia have a chance to say anything before Morgan started firing. He shot approximately five times, hitting Garcia in the stomach, right side, arm, and left shoulder. He then drove away westward.

¶ 10    Garcia stumbled over to a Dumpster that was by the foot of the staircase leading to his apartment and threw away the package of marijuana. He did this because he knew it was illegal and did not want the police to find him carrying it. At the time, Flowers was sitting in his car in the parking lot. Garcia stumbled over to Flowers' car and told Flowers to call the police and an ambulance. Ashley Cattouse, a man who lived in Garcia's apartment building, came outside and called the police. Garcia felt himself getting weak and told Flowers and Cattouse that he could not wait for an ambulance to arrive. The three of them got in Flowers' car and Flowers drove to the hospital.

¶ 11    Counsel for the State showed Garcia photographs of the crime scene. The photographs depict an alley, with parking spaces next to a building on the left and a fenced in parking lot to the right. Garcia indicated that his apartment building was the building on the left, and he was standing at the parking spaces next to his building when he was shot.

¶ 12    On the day after the shooting, December 27, 2001, Garcia spoke with Detective Robert Clemens. He told Detective Clemens that "Doo" had shot him, but he did not know Doo's real name or his address. On April 19, 2002, Garcia met with Detective Clemens, and Detective Clemens showed him a photo lineup. Garcia identified a photo of Morgan as Doo. On August

24, 2002, Garcia went to the police station and viewed an in-person lineup, where he again identified Morgan as the man who shot him.

¶ 13        On cross-examination, Garcia stated that he never stole marijuana from Morgan, and he also never stole any money from him. He did not know why Morgan decided to shoot him.

¶ 14        Megwa, the State's second occurrence witness, testified that in December 2001, she lived in the 1700 block of Touhy Avenue. On December 26, 2001, shortly after 1:30 p.m., she was in the parking lot behind 1713 Touhy Avenue, clearing snow off her parked car. She explained that the parking lot adjoins an alley that is shared by the 1700 block of Estes Avenue.

¶ 15        Megwa saw a red car in the alley, facing west. She was about two car-lengths away from the red car; she described its placement as "my car, this car, and then the fence, and then the [red] car." While she was clearing snow, she heard a popping sound like a firecracker coming from the vicinity of the red car. She looked toward the car and saw a dark-skinned man with a gun pointing out the window, firing toward a man who was hopping around in the Estes parking lot. The man in the red car stopped firing and drove away west. The other man continued hopping toward the back staircase of the building.

¶ 16        At the time, there was a green Camry in the parking lot with people inside it. Megwa saw people come out of that car and call for help. A young man came out of the apartment building. Together, they helped the victim into the green Camry and then drove away. As soon as they left, police cars arrived on the scene, and Megwa spoke with the police.

¶ 17        Flowers testified that on December 26, 2001, at around 1:30 p.m., he was sitting in his green Camry in a parking space behind the building at 1712 Estes Avenue. He was eating while waiting for his friend Cattouse, who lived in that building, to come out. His car was facing south, toward the building. Flowers saw Garcia pull up in a vehicle, park, and get out of his car.

Flowers stayed in his car and continued eating. A minute later, he saw Garcia walking toward the alley behind him. There was a red Camry in the alley, facing west. There was a dark-skinned individual in the car; Flowers thought it was a man, but he was not sure.

¶ 18        Flowers heard a popping noise like gunshots. He looked outside and saw Garcia jumping up and down next to his car. He asked Garcia what happened, and Garcia said to call 911. Flowers turned around and saw the back of the red Camry heading westbound out of the alley. Just then, Cattouse came out of the building. Cattouse and Flowers put Garcia in the car, and then Flowers drove away. He did not wait for an ambulance because he saw that Garcia was losing a lot of blood. On the way to the hospital, he encountered police, who escorted his car to the hospital.

¶ 19        Garcia's brother Ean also testified. In the summer of 2001, Ean worked at a shoe store. Morgan, whom he knew as Doo, was a frequent customer. Sometime that summer, Morgan asked Ean whether he knew of a place where he could store his marijuana. Ean said that he did and introduced him to his brother. That fall, Garcia stored Morgan's marijuana for him.

¶ 20        On December 26, 2001, Ean received a phone call from Flowers and Cattouse. He went to St. Francis Hospital and saw his brother, who had been shot. He also spoke with a police officer named Detective Clemens. On April 19, 2002, Ean met with Detective Clemens again and viewed a photo lineup, from which he identified Morgan as Doo.

¶ 21        Finally, the State called three police officers who were involved in the investigation of the shooting and Morgan's arrest. On December 26, 2001, at approximately 1:30 p.m., Detective Ed Heerdt responded to a call of shots fired at 1712 Estes Avenue. He arrived on the scene about 30 seconds later. There, he spoke to Megwa. He also observed a Dumpster to the left of the rear door of the apartment building on the Estes side of the alley. Standing next to the Dumpster,

Detective Heerdt smelled cannabis. He looked inside the Dumpster and recovered a large clear plastic bag filled with a green substance. The bag was inventoried and sent to the Illinois State Police crime lab. Chemical analysis showed that the bag contained 439.1 grams of marijuana. The parties stipulated that only one fingerprint on the bag was suitable for comparison; it belonged to Detective Heerdt.

¶ 22        Special Agent Dan Thomas stopped Morgan for a traffic violation on June 15, 2012. Morgan was driving a black Camry. Based on a later conversation with Detective Clemens, Agent Thomas arrested Morgan at his traffic court hearing on August 23, 2002. At this point, Agent Thomas observed that Morgan's Camry appeared to have been painted: wherever there was a crack or a crevice on the car, he could see reddish paint under the black paint. The car was registered to Denise Lesure, Morgan's mother.

¶ 23        On December 26, 2001, Detective Clemens was assigned to investigate Garcia's shooting. He spoke with Garcia at the hospital on December 27. Garcia said that the shooter was a dark man, approximately 6 feet tall and 160 pounds, who went by the name Doo. On April 19, 2012, Detective Clemens showed Garcia a photo lineup of six photographs, including a photograph of Morgan. Garcia identified the photograph of Morgan as Doo, the person who shot him. Detective Clemens separately showed the photographs to Ean, who also identified Morgan. On August 23, 2002, at an in-person lineup, Garcia again identified Morgan as the person who shot him.

¶ 24        The defense called three witnesses: Tai Hwang, Morgan's mother Lesure, and Morgan's friend Celest Young. In December 2001, Hwang was employed at Maaco Auto Painting and Body Shop. While he did not remember Morgan's face, he did remember getting a 1993 Camry in his shop with a particular vehicle identification number. He gave an estimate for painting that

car black on December 20, 2001. According to his receipt, the car was picked up on January 2, 2002. He acknowledged that he initially wrote on the receipt that the car was picked up on "2-2-02," but that date was incorrect; because it was the beginning of the year 2002 at the time, he accidentally wrote a "2," then changed it to a "1."

¶ 25    Hwang did not recall when the car was dropped off. However, he said that his shop would need four full working days to paint a car. The shop was closed on Sundays, on Christmas, and on New Year's Day. On December 24 and 31, the shop was open for a half-day so that people could pick up and drop off cars, but no work was done on those days. The court took judicial notice of the fact that December 20, 2001, was a Thursday. Based upon these facts, Hwang testified that the car would have had to be in the shop on December 24 or earlier in order to be ready for pickup on January 2.

¶ 26    Lesure, Morgan's mother, purchased a black 1993 Camry in March 2001. In November 2001, Morgan had it painted red without her permission. Lesure told him that he had no right to paint her car red, and she also told him to repaint it black.

¶ 27    On December 25, 2001, Lesure hosted a Christmas celebration at her house. Morgan was present, along with Young and various family members. Lesure explained that Young was not actually a family member, but Lesure thought of her as family because Lesure had known her since Young was seven years old. At the Christmas celebration, Lesure asked Morgan where her Camry was, and Morgan told her that it was in the shop, being repainted black. At some point in January she saw the car, and it was in fact black.

¶ 28    On the night of December 25, 2001, Lesure went to her job as a staff nurse, where she worked the night shift. She arrived home at around 7:30 a.m. on December 26. Morgan was still

at the house. Lesure testified that she stayed home from 7:30 a.m. until 3 p.m. on that day, and Morgan was at the house the entire time.

¶ 29    On cross-examination, Lesure stated that on August 24, 2002, she had a phone conversation with a detective. Lesure denied telling a detective that she was unaware her car had been repainted, adding: "You guys put what you want to put on those reports."

¶ 30    Young was a friend of Morgan, having known him for 20 years. On December 20, 2001, she went with him to drop off his car at Maaco. The car was a red Camry. On December 24, 2001, she went to spend the Christmas holiday at Morgan's mother's house. Morgan was there. They stayed there through December 26. Young testified that she did not at any time leave the house on December 26, 2001, and Morgan did not leave either. On January 2, 2001, she and Morgan picked up Morgan's car from Maaco, and it was painted black.

¶ 31    On cross-examination, Young stated that a police detective called her on August 24, 2002. She did not recall the detective asking her whether she had Christmas dinner at her house or at Morgan's house. Additionally, she denied telling the detective that Morgan stayed with her at her house.

¶ 32    After Young's testimony, the defense rested. The State then called Detective Clemens as a rebuttal witness. Detective Clemens testified that on August 23, 2002, Morgan was arrested for the shooting of Garcia. Morgan was allowed to make a phone call, and that phone number was recorded on Morgan's arrest report. On August 24, 2002, Detective Clemens called that phone number. The person on the other end identified herself as Celest Young. Detective Clemens asked her if she remembered the Christmas holiday of 2001. Young stated that she was with Morgan every day without exception. Detective Clemens asked her whether they had Christmas dinner together and whether it was at her house or Morgan's mother's house; Young could not

recall. Detective Clemens also asked her if Morgan stayed at her house in the city or at his mother's house, and Young told him that Morgan stayed with her at her house in the city.

¶ 33    On that same date, Detective Clemens called Lesure. Lesure told him that only family members were with her at her Christmas celebration. Lesure also said that she did not know that her car had been repainted.

¶ 34    After closing arguments, the jury returned a verdict of guilty on all charges. Following the verdict, Morgan's counsel raised concerns about Morgan's fitness for sentencing. The court later held a fitness hearing and found Morgan to be fit.

¶ 35    At Morgan's sentencing hearing, David Williams, a correctional officer for the Cook County department of corrections, testified in aggravation. Williams stated that on January 30, 2003, Morgan was returning from a psychiatric evaluation. A transportation officer requested that Morgan submit to a strip search, pursuant to prison policy. Morgan refused and struck Williams in the nose with a closed fist. He continued swinging and kicking, despite Williams instructing him to stop, and then ran out of the bullpen. Williams pursued him with two other officers, and after a long struggle, the officers were able to subdue him. Williams suffered a bloody nose and a fractured thumb from that incident.

¶ 36    Morgan's counsel asked that the testimony of Morgan's mother Lesure, who had testified at the fitness hearing immediately preceding, be adopted in mitigation. Lesure testified that she first learned that Morgan had psychiatric needs when he was four years old. He was having difficulties at daycare, and a social worker told Lesure that he was a child with special needs. Lesure had him evaluated by a variety of doctors and also sent him for psychiatric counseling until he entered high school. In high school, his condition improved; he still experienced

aggression and hallucinations, but they were minimal compared to previous years. Lesure testified that Morgan had attempted suicide three or four times in his adult life.

¶ 37    The trial court sentenced Morgan to 22 years' imprisonment for attempted murder and for aggravated battery, to be served concurrently. The court noted the seriousness of the offense, the fact that Morgan's conduct caused great bodily harm, Morgan's lack of remorse, and Morgan's prior contacts with the criminal justice system. Morgan appealed, and this court affirmed his convictions and sentences. *People v. Morgan*, No. 1-05-0924 (2007) (unpublished order under Supreme Court Rule 23).

¶ 38                        Postconviction Proceedings

¶ 39    On October 28, 2010, Morgan filed a *pro se* postconviction petition in which he raised three claims. First, he stated that he had newly discovered evidence of his actual innocence: Coleman, a witness to the crime, had come forward after nine years to state that Morgan was not the shooter. In an attached affidavit, Coleman averred that on December 26, 2001, sometime between 12:30 p.m. and 2 p.m., as she was standing in the parking lot behind 1713 Touhy Avenue, she saw a man named Big John, or B.J., pull up in a red Beretta. Coleman could see B.J. clearly and was "very familiar" with him, since she used to read Bible verses to him and his friends. Coleman observed a black man approaching B.J.'s car. The two of them spoke for a few seconds, and then B.J. reached out the window and fired a gun at the other man. Coleman stated that she had never previously mentioned this incident to anyone besides her family because she lived a block away and did not want to endanger herself or her children.

¶ 40    Morgan's second claim was that his trial counsel at sentencing was ineffective for failing to call mitigation witnesses on his behalf. Morgan stated that he contacted three such witnesses

prior to sentencing, but his counsel failed to consult with him regarding a motion to reconsider his sentence and, as a result, failed to interview and call those witnesses.

¶ 41     In support of this claim, Morgan attached affidavits from each of the three witnesses. Marcus Dwight, the owner of T&M Towing Company, stated that Morgan asked him to testify as a character witness as his sentencing hearing. However, Morgan's attorney never contacted him, so he was unable to attend the hearing. If Dwight had been called to the hearing, he would have testified that he had known Morgan for 15 years. Morgan was hardworking, industrious, and kind, and on numerous occasions he helped elderly people in the community to cut their lawns and shovel snow. Dwight opined that Morgan had "great rehabilitative potential" and stated that he was planning to hire him upon completion of his sentence.

¶ 42     Savonya Bishop, the second mitigation witness, averred that she wanted to testify at Morgan's sentencing hearing but his attorney failed to return her calls. She stated that she had been a friend of Morgan's family for 18 years. She described Morgan as "a good person, who sometimes seem[s] to make bad decisions." She said that he was loving, caring, and helpful, and he was one of the community's football coaches.

¶ 43     Colleen Stewart, the final mitigation witness, stated that she had wanted to speak on Morgan's behalf during the sentencing hearing. Morgan's attorney assured her that she would have an opportunity to testify, but he did not contact her again, and she later learned that Morgan had received a 22-year sentence. Stewart said that she had known Morgan for most of her life. At the time of his incarceration, Morgan was beginning to turn his life around and was attending Elgin Community College to obtain a commercial driver's license so that he could become a truck driver. He always spoke about giving back to the community, and he mentored kids to teach them how to overcome adversity in negative environments. On numerous occasions, he

volunteered to work in the jail's hospital to help the sick and elderly. He voluntarily took many classes on self-development and had received certificates in substance abuse, anger management, parenting, and lifestyle redirection. He was also a full-time participant in a violence prevention program. He frequently spoke about learning from his mistakes and not repeating them. Stewart concluded that "[r]ehabilitation consist[s] of many area's [*sic*] of growth in one's life" and stated that Morgan's growth had been astronomical.

¶ 44        Morgan's final claim was that his counsel on direct appeal was ineffective for failing to raise the ineffectiveness of his trial counsel at sentencing. The same attorney represented him at his sentencing hearing and on direct appeal. Morgan noted that it was unlikely that an attorney would raise her own ineffectiveness as an issue on appeal, and, in fact, his attorney did not.

¶ 45        After Morgan's petition survived first-stage review, the State filed a motion to dismiss Morgan's ineffective assistance claims. The court granted the State's motion for three reasons: first, it was unclear whether Morgan's trial counsel had been aware of the mitigation witnesses, since Morgan did not present any affidavit stating that he told his trial counsel about them; second, deciding whether to call the witnesses would have been a matter of strategy at the sentencing hearing; and third, the judge stated that the witnesses "were definitely not going to change [her] mind as to the sentence of this individual" in light of the facts of the case.

¶ 46        The case proceeded to a third-stage evidentiary hearing on Morgan's actual innocence claim. Coleman was the only witness at that hearing. Coleman testified that on December 26, 2001, between 12:30 p.m. and 2 p.m., she was smoking a cigarette next to her car in the parking lot behind the apartment building at 1713 Touhy Avenue. She was waiting there because she was going to pick up her friend Betty Sue and take her to get drugs. At that time, Coleman

smoked marijuana "mostly everyday," but she did not think that she had used any drugs on that particular day.

¶ 47        After Coleman had been waiting for around 20 to 30 minutes, she saw a red Camaro drive through the nearby alley, traveling westbound. (On cross-examination, when asked to clarify the make of the car, she said, "I'm not very good on makes and models. I get a Camry—I have always got a Camry and a Camaro—a Camaro—it was a Camaro—it was a Camry out there. It was not a Camaro. *** I'm not very educated on all these different types of cars." But in her later testimony she continued to refer to the car as a Camaro.) The red Camaro stopped in the alley for a few minutes and then drove away.

¶ 48        A few seconds later, a red Beretta drove into the alley and stopped. It was facing westbound, and the driver's side of the car was facing Coleman, so that she could see the driver. He was a tall, dark, and slender man who seemed like he was too big for the car. Coleman estimated that he was 20 to 25 years old and around 150 to 180 pounds. She recognized him as Big John, or B.J., whom she had seen "quite a bit of times on the street."

¶ 49        Another man emerged from a building, walked up to the Beretta, and spoke with B.J. Coleman could see B.J. clearly, but the other man had his back to Coleman, and she did not get a good look at him. A few minutes later, B.J. reached out of the car and started shooting. Coleman was scared and knelt down by her car. She heard five shots, and then the red Beretta sped out of the alley. The victim stumbled over to a Dumpster, which was located on the Touhy Avenue side of the alley, closer to where Coleman was, and tossed something inside. After that, Coleman immediately jumped in her car and left. She did not go help the victim, and she did not see anyone else going to help the victim. In fact, she did not see anyone else in the vicinity besides herself, the victim, and the shooter.

¶ 50        Counsel for the State asked Coleman whether she drove past the victim when she exited the parking lot, and the following colloquy occurred:

> "COLEMAN: I didn't drive right past the victim. I don't even—I just jumped in my car and I left.
>
> Q. Well, the only way out of the parking lot, though, because this is a fenced-in parking lot—
>
> A. It's not a fenced-in parking lot, no ma'am.
>
> Q. It is not?
>
> A. No, it's not."

¶ 51        Coleman testified that she did not ever call the police regarding the incident, because she was worried about her family's safety. She also did not talk to Betty Sue after the incident to explain why she was not there to pick her up. In fact, she never saw Betty Sue again.

¶ 52        Coleman then testified about the events leading her to come forward to testify on Morgan's behalf. On June 25, 2010, while walking in Rogers Park, Coleman encountered a man named Jonathan, whom she recognized from the neighborhood. They conversed, and Jonathan told her that Morgan was in prison. Coleman did not know Morgan's name before that day, although she was familiar with him "from the street only."

¶ 53        After Coleman's conversation with Jonathan, Morgan's fiancée Melissa got in touch with her. Melissa asked Coleman what she saw on December 26, 2001, and Coleman explained it to her. Melissa then typed up an affidavit, brought it to Coleman's house, and brought Coleman to have the affidavit notarized. Melissa also contacted Coleman to ask her to testify at the postconviction hearing. Coleman testified that, prior to the date Melissa brought her the affidavit to sign, she had never met Melissa or spoken with her on the phone.

¶ 54        At the conclusion of Coleman's testimony, the State moved for a directed finding, arguing that Coleman's testimony was not so conclusive as to change the outcome at a retrial. The trial court granted the State's motion, finding that Coleman was not credible. It stated that her ability to recall events was questionable because of her marijuana usage. Additionally, there were numerous inconsistencies between her testimony at the hearing and the testimony of other eyewitnesses at trial. The court concluded that, even if the jury had heard Coleman's testimony, its verdict would have been the same. Morgan now appeals.

¶ 55                                    ANALYSIS

¶ 56        On appeal, Morgan raises three contentions of error. First, he challenges the trial court's denial of his actual innocence claim. Second, he challenges the trial court's denial of his ineffective assistance claim based on his counsel's failure to call mitigation witnesses at sentencing. Third, he contends that his postconviction counsel violated Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) by failing to consult with him regarding his constitutional claims. We consider these claims in turn.

¶ 57                              Actual Innocence

¶ 58        Morgan first contends that the trial court erred in denying him a new trial where Coleman's testimony was newly discovered and material evidence of his innocence that would likely change the result on retrial. The State concedes that Coleman's testimony was new and material, but it argues that the trial court properly found that her testimony was not credible and, therefore, would not change the result on retrial.

¶ 59        As noted above, the trial court denied Morgan's actual innocence claim at the third stage of postconviction proceedings. A postconviction petition brought under the Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) is adjudicated in three

stages. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). At the first stage, the circuit court independently reviews the petition within 90 days of its filing and summarily dismisses the petition if it finds it to be "frivolous or *** patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2012). If the circuit court does not dismiss the postconviction petition at the first stage, it advances to the second stage, where counsel is appointed to represent the defendant and the State is allowed to file a responsive pleading. *Edwards*, 197 Ill. 2d at 245-46. A petition will be dismissed at this stage if it fails to make a substantial showing of a constitutional violation. *Id.* at 246. Finally, if such a showing is made, the petition advances to the third stage, where the circuit court conducts an evidentiary hearing on its allegations. *Id.*

¶ 60     At a third-stage evidentiary hearing, the burden is on the petitioner to make a substantial showing of a deprivation of constitutional rights. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002); *People v. Childress*, 191 Ill. 2d 168, 174 (2000). The circuit court, serving as the finder of fact, must determine witness credibility, weigh the testimony and evidence, and resolve any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. We will not reverse the circuit court's decision unless it is manifestly erroneous (*People v. English*, 2013 IL 112890, ¶ 23), meaning that the court's error is "clearly evident, plain, and indisputable" (*People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 61     The due process clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 2) enables postconviction petitioners to raise freestanding claims of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). In order to warrant a new trial, an actual innocence claim must be supported by evidence that is (1) newly discovered, (2) material and not merely cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Id.*; *People v. Harris*, 206 Ill. 2d 293, 301 (2002). Only the third of

these elements is at issue here. The trial court denied Morgan a new trial based upon its finding that Coleman's testimony was not credible and would not change the jury's finding of guilt.

¶ 62        Under the facts of this case, the trial court's finding was not manifestly erroneous. Coleman's testimony was contradicted in numerous ways by multiple witnesses at trial, as well as by the photographic evidence. The first such contradiction concerns the victim's location during the shooting. Garcia testified that he exited his apartment building at 1712 Estes and was in the Estes parking lot when he was shot. Megwa and Flowers also testified that Garcia was on the Estes Avenue side of the alley when he was shot. Coleman, however, contradicted all three of them by placing Garcia on the Touhy Avenue side of the alley during the shooting.

¶ 63        Similarly, Garcia testified that he threw away the package of marijuana in a Dumpster next to his building, on the Estes Avenue side of the alley. This testimony was corroborated by Detective Heerdt, who found the package in that Dumpster. Crime scene photos show that the Dumpster is on the Estes Avenue side. However, Coleman testified that she saw the victim throwing something in a Dumpster on the Touhy Avenue side of the alley.

¶ 64        Additionally, Coleman's testimony was internally inconsistent. Coleman testified that as she stood in the parking lot at 1713 Touhy Avenue, the driver's side of the shooter's car was facing her, and she could clearly see the driver's face. However, all three eyewitnesses at trial, as well as Coleman, testified that the shooter's car was facing west. The car was in an east-west alley with Touhy Avenue to the north and Estes Avenue to the south. Accordingly, the driver's side of the car would have had to be facing south toward Estes Avenue and away from Coleman.

¶ 65        Coleman's account of events after the shooting is also soundly contradicted by the testimony at trial. Coleman testified that she did not see anyone else in the vicinity besides herself, the shooter, and the victim. She did not see anyone helping the victim. Although she

testified that she saw a woman wiping snow off her car before the shooting, while she was waiting for Betty Sue, she stated unequivocally that she saw nobody else in the parking lot at the time she left the crime scene. By contrast, Garcia, Flowers, and Megwa all testified to Flowers helping Garcia into his car after the shooting and driving him to the hospital. Megwa, the woman wiping snow off her car, testified that she was in the Touhy parking lot during the shooting and remained outside to talk to police. Her testimony is corroborated by Detective Heerdt, who responded to a call of shots fired at 1712 Estes Avenue and arrived on the scene in approximately 30 seconds, where he spoke with Megwa.

¶ 66         Finally, the crime scene photos presented at trial clearly show a fence around the Touhy parking lot, and Megwa also testified that there was a fence between her and the shooter's car. Nevertheless, Coleman vigorously denied that the Touhy parking lot was fenced in and also stated that she did not have to drive past the victim to exit the parking lot.

¶ 67         Given this mass of contradictions between Coleman's testimony and the testimony and photographic evidence at trial, the trial court had ample basis for its finding that Coleman was not credible. This is particularly true in light of Coleman's admission that at the time she smoked marijuana "mostly everyday," which may well have affected her ability to recall events.

¶ 68         Morgan argues that, if Coleman's credibility is diminished by her drug use, then Garcia's credibility is reduced as well, since he was holding marijuana for Morgan. However, Garcia did not testify that he used any marijuana near the date of the shooting, let alone that he was a daily user of marijuana like Coleman. Consequently, his reliability is not impacted in the same manner as Coleman's.

¶ 69         At a third-stage evidentiary hearing, it is the trial court's province to determine witness credibility, weigh testimony and evidence, and resolve evidentiary conflicts. *Domagala*, 2013 IL

113688, ¶ 34. *People v. Gonzalez*, 407 Ill. App. 3d 1026 (2011), is instructive in this regard. In *Gonzalez*, following his conviction for first-degree murder, defendant filed a postconviction petition claiming actual innocence. *Id.* at 1028. In support, he presented the affidavit of his codefendant Lewis, who stated that he killed the victim and that defendant was not involved. *Id.* After an evidentiary hearing, the trial court denied the petition, finding that Lewis' testimony was " 'not the slightest bit credible' " and " 'verge[d] on being worthless.' " *Id.* at 1036. This court affirmed, stating: "[c]redibility determinations such as this are properly made by the trier of fact, and we have no basis in the record for second-guessing the trial court's judgment." *Id.*

¶ 70      Similarly, in *People v. Carter*, 2013 IL App (2d) 110703, defendant was convicted of murder and raised a claim of actual innocence based upon the affidavit of a codefendant who stated that he acted alone in committing the murder. Following an evidentiary hearing, the trial court denied defendant's petition, stating that the codefendant's testimony was " 'illogical and improbable in light of all the other evidence in the case.' " *Id.* ¶ 70. The *Carter* court affirmed, emphasizing that such credibility determinations are properly left to the trial court. *Id.* ¶¶ 76-85.

¶ 71      In keeping with *Gonzalez* and *Carter*, and in light of the numerous evidentiary conflicts and internal inconsistencies presented by Coleman's testimony, the trial court did not manifestly err in finding that Coleman's testimony was not credible and would not likely change the result on retrial. We therefore affirm the trial court's denial of Morgan's actual innocence claim.

¶ 72                            Ineffective Assistance of Counsel

¶ 73      Morgan also contends that his trial counsel was ineffective for failing to interview and call mitigation witnesses at his sentencing hearing, and his counsel on direct appeal was ineffective for failing to raise her own ineffectiveness at sentencing. These claims were dismissed at the second stage of postconviction proceedings.

¶ 74        At the second stage of postconviction proceedings, all well-pleaded facts that are not affirmatively refuted by the trial record are to be taken as true. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The petitioner is entitled to an evidentiary hearing if he makes a substantial showing of a constitutional violation (*People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001)), meaning that the allegations of his petition, if true, would entitle him to relief. *People v. Domagala*, 2013 IL 113688, ¶ 35. We review the circuit court's second-stage dismissal of a postconviction petition *de novo*. *People v. Whitfield*, 217 Ill. 2d 177, 182 (2005); *Coleman*, 183 Ill. 2d at 389.

¶ 75        Under the sixth and fourteenth amendments to the United States Constitution and article I, section 8 of the Illinois Constitution, a criminal defendant has a right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685 (1984); *People v. Jackson*, 205 Ill. 2d 247, 258-59 (2001); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) this deficiency was prejudicial to the defense. *People v. Mitchell*, 189 Ill. 2d 312, 332 (2000) (citing *Strickland*, 466 U.S. at 687). Both prongs of this test must be satisfied before a petitioner can prevail on an ineffective assistance claim. *People v. Eddmonds*, 143 Ill. 2d 501, 511 (1991). Moreover, petitioner must overcome a strong presumption that counsel's representation was constitutionally adequate. *People v. Walker*, 262 Ill. App. 3d 796, 804 (1994).

¶ 76        In his postconviction petition, Morgan presented affidavits from three potential mitigation witnesses: Dwight, Bishop, and Stewart. Morgan contends that counsel's failure to consult with him regarding a motion to reconsider sentence prevented these three people from being interviewed and called to testify on his behalf.

¶ 77    Initially, the State correctly points out that Morgan's petition did not state that his sentencing counsel knew about the existence of these witnesses. Although Morgan alleged that he personally contacted the witnesses, he never alleged that he told his attorney about them, nor did he make any such allegations in an affidavit. Counsel cannot be deemed ineffective for failing to investigate witnesses that she did not know existed. As this court has previously stated, "Effective counsel is not required to be clairvoyant." *People v. Vasser*, 331 Ill. App. 3d 675, 685 (2002).

¶ 78    In response, Morgan argues that the affidavits of two of his witnesses show that they had either spoken or attempted to speak to Morgan's counsel. Specifically, Stewart stated in her affidavit that Morgan's attorney assured her that she would be able to testify at the sentencing hearing but did not contact her again. Bishop averred that she wanted to testify at the hearing, but Morgan's attorney did not return her calls. However, neither of these witnesses specified which attorney they were referring to. Morgan had four different attorneys during the nearly two-year period between the guilty verdict and his sentencing hearing. Nicholas Giordano represented Morgan at trial. Two months after trial, Morgan retained attorney Charles Huff, who represented him for several posttrial court dates before withdrawing. The court then appointed the public defender to represent Morgan. Finally, Morgan hired attorney Anita Rivkin-Carothers, who represented him at his sentencing hearing and on direct appeal. The petition does not contain any allegations concerning which of these attorneys Stewart and Bishop might have contacted or attempted to contact. Moreover, Dwight does not allege that he attempted to contact any of Morgan's attorneys. Thus, even accepting all well-pled allegations in Morgan's petition as true (*Domagala*, 2013 IL 113688, ¶ 35), Morgan has not shown that Rivkin-Carothers

knew or should have known about the existence of these mitigation witnesses. See *Vasser*, 331 Ill. App. 3d at 685.

¶ 79    Additionally, even if we were to assume that Rivkin-Carothers was aware of Bishop, there were legitimate strategic reasons not to present her testimony. Courts defer to trial counsel's strategic decisions regarding the presentation of mitigation evidence. *People v. Steidl*, 142 Ill. 2d 204, 249 (1991). In particular, "[a]n informed decision not to present certain mitigating evidence may represent a valid strategic choice, particularly where the evidence is potentially damaging." *People v. Coleman*, 168 Ill. 2d 509, 535 (1995). In this case, Bishop characterized Morgan in her affidavit as "a good person, who sometimes seem[s] to make bad decisions." It would have been reasonable for Morgan's counsel not to take the risk of having Bishop cross-examined on Morgan's "bad decisions," which might have painted him in a worse light. Morgan argues that a mitigation witness does not have to portray a defendant as flawless in order to be effective. While this may be true in some circumstances, weighing the potential negative effects of such testimony is the kind of strategic decision by counsel that courts will not second-guess. See *People v. Szabo*, 186 Ill. 2d 19, 28 (1998) (declining to second-guess counsel's decision not to present certain mitigation witnesses at resentencing hearing).

¶ 80    Finally, Morgan has not shown that he was prejudiced by the absence of these three mitigation witnesses at his sentencing hearing. See *People v. Flores*, 153 Ill. 2d 264, 283-84 (1992) (where counsel's actions did not prejudice defendant, that is sufficient to dispose of ineffective assistance claim regardless of whether counsel's performance was deficient). In the context of a sentencing hearing, prejudice must be assessed based on the totality of the evidence, including both potential evidence in mitigation and the evidence in aggravation. *People v. Simon*, 2014 IL App (1st) 130567, ¶ 72 (quoting *Coleman*, 168 Ill. 2d at 538). In this case, the

aggravation evidence against Morgan was quite strong.  Morgan shot the victim five times, in a public alley and in broad daylight, within feet of two innocent bystanders.  He had a felony background that included two convictions for drug offenses.  Moreover, Officer Williams testified in aggravation that while incarcerated and awaiting sentencing, Morgan was involved in a violent altercation with him and two additional guards.  Given this evidence, "[t]he failure of defendant's trial counsel to place more information from defendant's past onto the scale probably would not have tipped it in defendant's favor."  *People v. Easley*, 192 Ill. 2d 307, 341 (2000); see *Simon*, 2014 IL App (1st) 130567, ¶ 72 (counsel was not ineffective for failing to present mitigation evidence at sentencing where trial court emphasized that victim was shot to death during the middle of the day in front of a grocery store, multiple shots were fired, and defendant was " 'not a newcomer' " to the criminal justice system).  Indeed, the judge who presided over these postconviction proceedings was also Morgan's trial and sentencing judge, and she specifically found that she would not have imposed a different sentence even if Morgan's mitigation witnesses testified consistently with their affidavits at the sentencing hearing.  Thus, there is not a reasonable probability that the testimony of these witnesses would have changed the result of Morgan's sentencing hearing.  See *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (to show prejudice, defendant must establish " 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' " (quoting *Strickland*, 466 U.S. at 694)).

¶ 81        Thus, we find that Morgan's sentencing counsel was not ineffective for failing to call mitigation witnesses at his sentencing hearing or for failing to raise her own ineffectiveness on appeal.  Because we have found that Morgan's claim of ineffective assistance of trial counsel lacks merit, he incurred no prejudice from appellate counsel's failure to raise that claim on direct

appeal. See *People v. Petrenko*, 385 Ill. App. 3d 479, 482 (2008) ("[I]f defendant's ineffective assistance of counsel claim against trial counsel is nonmeritorious, then clearly appellate counsel was not deficient for refraining from addressing it.").

¶ 82                                        Rule 651(c) Consultation Requirement

¶ 83        Morgan's final contention is that his postconviction counsel failed to consult with him regarding his constitutional claims, in violation of Rule 651(c). Morgan asserts that he hired a private attorney, Sam Adam, Sr., to represent him in connection with his postconviction petition. However, Adam Sr. did not ever personally consult with him regarding his constitutional claims. Instead, at most, Adam Sr. sent his son and law partner, Sam Adam, Jr., as an "intermediary" to consult with Morgan. Morgan argues that consultation via an intermediary does not satisfy the consultation requirement of Rule 651(c). He also argues that it is questionable whether Adam Jr. consulted with him at all, based on a letter sent by Adam Sr. to the Attorney Registration and Disciplinary Commission (ARDC). The State argues that the record shows that Morgan agreed to be jointly represented by both Adam Sr. and Adam Jr., and the two of them took all actions necessary to satisfy Rule 651(c). We agree with the State.

¶ 84        The record shows that on July 15, 2011, after Morgan's petition had passed the first stage of postconviction review, Adam Sr. filed an appearance on behalf of Morgan. On October 7, 2011, Adam Sr. appeared in court and stated that he was going to rest on Morgan's *pro se* postconviction petition and was ready for the State to file a response. The court set a date of December 2, 2011, for Adam Sr. to file a certificate of compliance with Rule 651(c) or an amended petition.

¶ 85        On October 26, 2011, Morgan wrote a letter to the clerk of the circuit court, stating: "I've reached out to my attorney seval [*sic*] times to amend my pro se petition, but I still don't know

what's going on. I'm sending you copies of various documentations to safe-guard myself, so you could put these letters in my case file." Attached are three letters from Adam Sr. to Morgan. In the first letter, dated July 15, 2011, Adam Sr. stated that "we" officially entered Morgan's case and might need to amend the petition to include allegations related to the actual innocence claim. In the second letter, dated September 6, 2011, Adam Sr. stated that he had received and read Morgan's documents and was working on his postconviction petition. Finally, in the third letter, dated September 30, 2011, Adam Sr. stated that he had met with Adam Jr. and Morgan's friend and "explained everything as of this date."

¶ 86        Also on October 26, 2011, Morgan wrote a letter to Judge Haberkorn in which he said, "I haven't spoken with my attorney and I've written him several times to amend my pro se petition with allegations ***." Morgan attached a 22-page handwritten document entitled "Allegations That I Wanted The Lawyer To Amend My Petition With." Most of the issues raised by Morgan related to alleged trial errors that either were or could have been raised in Morgan's direct appeal. See *People v. Evans*, 186 Ill. 2d 83, 89 (1999) (if an issue was actually decided on direct appeal, *res judicata* precludes it from being raised again in a postconviction petition, and if an issue could have been presented on direct appeal but was not, it is forfeited); *People v. Thomas*, 164 Ill. 2d 410, 416 (1995) (same).

¶ 87        Morgan also attached copies of two letters that he sent to Adam Sr. In the first letter, dated October 12, 2011, Morgan detailed multiple avenues of investigation that he wanted his counsel to pursue. First, he said that he wanted "you guys" to obtain Garcia's cell phone records to show that he did not call Garcia. Second, he said that he wanted counsel to talk to Garcia and find out if prosecutors made a deal with him in exchange for his testimony. He stated, "Sam Jr. said when he first met me a year ago, that he would send his investigator to talk to this victim

witness." Third, Morgan said that Detective Clemens was "the same detective that put a murder case on me in 1998." Morgan said that Adam Jr. had told him that he would look up his 1998 case to verify that it was the same detective.

¶ 88    In his second letter to Adam Sr., dated October 26, 2011, Morgan said: "I want my petition amended with all of the allegation's [*sic*] that I sent to you within my 22 page letter." He stated that all of his past attorneys had "messed [him] over" and also said: "I am not saying that you guys are trying to messed [*sic*] me over ***. Unless the judge let you just proceed without consulting with me." He noted that since the court date on October 7, 2011, counsel had not set up a conference call with him, come to see him, or written him to discuss his defense.

¶ 89    On December 2, 2011, Adam Sr. and Adam Jr. filed a joint affidavit pursuant to Rule 651(c). The affidavit stated that both Adam Sr. and Adam Jr. were attorneys licensed to practice law in Illinois. Morgan contacted Adam Jr. to request representation on his postconviction petition. Adam Jr. visited Morgan at the Illinois Department of Corrections and discussed each of his claims with him "in full." After that, Adam Sr. discussed Morgan's claims with Adam Jr. and also reviewed the trial record in Morgan's case. Based upon this review, he concluded that Morgan's *pro se* petition was fully adequate to assert his constitutional claims and did not need to be amended to more fully assert those claims.

¶ 90    On that same date, Morgan filed an affidavit in which he stated that he wanted his counsel to supplement his postconviction petition with various additional claims. He further stated: "If my attorney Sam Adam met the requirement's [*sic*] of the Supreme Court Rule 651 by consulting with his client, we could have cleared any confusion or misunderstanding's [*sic*]."

¶ 91    Lastly, defendant submitted a "Supplemental Common Law Record" to this court, containing a letter sent by Adam Sr. to the ARDC on July 8, 2013, a month after the trial court

denied Morgan's petition. This letter was not before the trial court and it is unclear, therefore, why it is included in a supplemental record. In the letter, Adam Sr. stated that he was writing in answer to a complaint filed by Morgan. He stated: "[T]he post-conviction petition and hearing thereon, and all aspects of same, was completely and totally handled by me. Attorney Sam Adam, Jr. had nothing at all to do with this litigation."

¶ 92        Under the Act, postconviction counsel is required only to provide a petitioner with a "reasonable" level of assistance. (Emphasis omitted.) *People v. Owens*, 139 Ill. 2d 351, 364 (1990); *People v. Wright*, 149 Ill. 2d 36, 64 (1992). To this end, at the time that counsel's certificate was filed in this case, Rule 651(c) required the record to show that postconviction counsel "has consulted with petitioner either by mail or in person to ascertain his contentions of deprivation of constitutional rights, has examined the record of the proceedings at trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. Dec. 1, 1984).[1] An attorney can satisfy Rule 651(c) by meeting with the petitioner on a single occasion, as long as that meeting allows the attorney to ascertain the petitioner's constitutional claims. *People v. Turner*, 187 Ill. 2d 406, 411 (1999); see also *People v. Stewart*, 121 Ill. 2d 93, 101-03 (1988) (attorney satisfied consultation requirement where, during a brief phone call with the petitioner, he outlined the issues in the petition and asked petitioner whether there were any issues he would like to include). When attorneys file a certificate under Rule 651(c), they are officially representing to the court that the duties listed in the certificate have been fulfilled, and it creates a rebuttable presumption that postconviction counsel has provided reasonable assistance. *People*

---

[1] The rule has since been amended to state that the attorney-client consultation may be made "by phone, mail, electronic means or in person." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013).

*v. Perkins*, 229 Ill. 2d 34, 50-51 (2007); *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. Our review of an attorney's compliance with a supreme court rule is *de novo*. *Profit*, 2012 IL App (1st) 101307, ¶ 17.

¶ 93    In this case, although Adam Sr. was the only attorney of record for Morgan, a full reading of the record shows that Morgan agreed to be jointly represented by both Adam Sr. and Adam Jr. The letters sent to and from Morgan and his attorneys demonstrate that Morgan understood and accepted that both attorneys would be active in the case. In Morgan's letters, he repeatedly referred to his counsel as "you guys" or "you all." He discussed his in-person meeting with Adam Jr. and described certain investigative actions that he claimed Adam Jr. promised to take on his behalf. Further evidence of joint representation is found in Adam Sr.'s letters to Morgan. In his July 15, 2011 letter, Adam Sr. stated that "we officially entered your case" and "[w]e shall begin to familiarize ourselves with the record." Likewise, in his September 30, 2011 letter, Adam Sr. told Morgan that he met with Adam Jr. and "explained everything as of this date." This correspondence establishes that Morgan agreed to joint representation in his postconviction proceedings and cannot now complain that Adam Sr. did not himself fulfill all of the requirements of Rule 651(c). See *People v. Carter*, 208 Ill. 2d 309, 319 (2003) ("Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error.").

¶ 94    Given that Morgan agreed to be represented by both attorneys, the joint certificate of Adam Sr. and Adam Jr. demonstrates that the attorneys took all actions necessary to comply with Rule 651(c). The certificate states that Adam Jr. visited Morgan in person and discussed his claims with him "in full"–a statement that is corroborated by Morgan's references in his letters to talking about his claims with Adam Jr. See *Turner*, 187 Ill. 2d at 411 (single meeting with

petitioner satisfied Rule 651(c)); *Stewart*, 121 Ill. 2d at 101-03 (brief phone call with petitioner satisfied Rule 651(c)). The certificate further states that Adam Jr. discussed the case with Adam Sr., who reviewed the record and decided not to amend the petition. Thus, it creates a presumption that postconviction counsel, acting jointly, provided reasonable assistance, and this presumption is not rebutted by any evidence of record. See *Profit*, 2012 IL App (1st) 101307, ¶ 19.

¶ 95    In this regard, the present case is analogous to *People v. Westbrook*, 5 Ill. App. 3d 970, 973 (1972). The *Westbrook* defendant appealed the dismissal of his postconviction petition, alleging that his attorney, McDermott, violated Rule 651(c) by never discussing his case with him. *Id.* at 972-73. The defendant acknowledged that he did meet and discuss his case with McDermott's law partner. *Id.* at 973. Under these facts, the *Westbrook* court found no Rule 651(c) violation, since defendant suffered no prejudice from meeting with McDermott's law partner rather than with McDermott himself. *Id.* Similarly, in the present case, we fail to see how Morgan was prejudiced by his attorneys' conduct, since he concedes in his letters that he met in person with Adam Jr., who then discussed Morgan's constitutional claims with Adam Sr.

¶ 96    Morgan argues that *Westbrook* is distinguishable because the *Westbrook* attorneys took simultaneous active roles in representing the defendant, whereas Adam Jr. essentially dropped out of the case after his initial meeting with Morgan. This assertion is not supported by the record. On the contrary, in his September 30, 2011, letter to Morgan, Adam Sr. stated that he met that morning with Adam Jr. and "explained everything as of this date," indicating that Adam Jr. was still playing an active role in Morgan's representation.

¶ 97    Morgan nevertheless argues that any allegations regarding Adam Jr.'s representation of Morgan are positively rebutted by Adam Sr.'s letter to the ARDC, in which he states: "[T]he

post-conviction petition and hearing thereon, and all aspects of same, was completely and totally handled by me. Attorney Sam Adam, Jr. had nothing at all to do with this litigation." But we will not consider this letter, since it was never presented to or considered by the trial court. As we have previously stated, "The purpose of appellate review is to evaluate the record presented in the trial court, and review must be confined to what appears in the record." *People v. Canulli*, 341 Ill. App. 3d 361, 367-68 (2003); see also *People v. Mehlberg*, 249 Ill. App. 3d 499, 532 (1993) (striking secondary materials contained in defendant's brief that were not part of the trial record).

¶ 98     Morgan argues that Illinois courts of review regularly allow the record to be supplemented on appeal when determining the issue of Rule 651(c) compliance. See *People v. Harris*, 50 Ill. 2d 31, 33-34 (1971) (where the record did not contain a Rule 651(c) certificate, the court gave the State 15 days to file such a certificate); *People v. Johnson*, 154 Ill. 2d 227, 241 (1993) (during pendency of appeal, court permitted postconviction counsel to file an affidavit as a supplemental record demonstrating that he did not satisfy the requirements of Rule 651(c)). However, we note that our supreme court has since limited its decision in *Johnson*. *People v. Perkins*, 229 Ill. 2d 34, 51-52 (2007). The *Perkins* defendant attached his own affidavit to his petition for rehearing in support of his argument that postconviction counsel failed to comply with Rule 651(c). *Id.* at 51. The court declined to consider the affidavit, citing the well-established rule that affidavits not filed in the trial court cannot be considered part of the record on appeal. *Id.* at 51-52 (citing *Kazubowski v. Kazubowski*, 45 Ill. 2d 405, 415 (1970)). The court also found *Johnson* distinguishable because, among other factors, submission of the affidavit in *Johnson* was apparently not challenged by either party. *Id.* at 52. In this case, the State

vigorously challenges the submission of the ARDC letter, making this case more akin to *Perkins* than to *Johnson*.

¶ 99    Additionally, *Harris* and *Johnson* are both distinguishable for another reason: those cases concern the submission of a certificate or sworn affidavit. Here, Morgan does not seek to submit his own affidavit stating, for example, that he never met with Adam Jr. Rather, Morgan is seeking to submit private correspondence to which he was not a party to contradict sworn statements submitted by an officer of the court. We decline to extend *Harris* and *Johnson* to permit consideration of such a document.

¶ 100    Moreover, even if we considered Adam Sr.'s letter to the ARDC, we do not believe it positively rebuts any of the assertions in counsel's Rule 651(c) certificate. The letter appears to be written in response to a complaint by Morgan that his counsel did not return his trial records in a timely fashion. Adam Sr. explained that he had not yet returned the records because his office recently changed locations and many files, including Morgan's, were placed in storage. Further, Adam Sr. was the only attorney who filed an appearance on Morgan's behalf in the trial court. It is in this context that he states that Adam Jr. "had nothing at all to do with this litigation." Because the entire letter is focused upon Morgan's trial record, it is entirely plausible that he meant only to say that Adam Jr. had nothing to do with the handling of that record. Such an interpretation would be consistent with the Rule 651(c) certificate, which states that Adam Sr. is the one who reviewed Morgan's trial record. Accordingly, the ARDC letter would not serve to rebut the statement in the certificate that Adam Jr. personally met with Morgan, discussed his claims with him, and then relayed that information to Adam Sr.

¶ 101                                  CONCLUSION

¶ 102          We find that the trial court did not commit manifest error in rejecting Morgan's actual innocence claim based upon its finding that Coleman's testimony was incredible and would not have changed the result at trial. Nor did the trial court err in dismissing Morgan's claim of ineffective assistance of counsel. Finally, the record shows that postconviction counsel satisfied the requirements of Rule 651(c), in that Morgan agreed to be jointly represented by Adam Sr. and Adam Jr., and those attorneys took all actions necessary under the rule.

¶ 103          The judgment of the trial court is affirmed.

¶ 104          Affirmed.